UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number:** _____

SOUTHERN ALLIANCE FOR CLEAN ENERGY
and TROPICAL AUDUBON SOCIETY
INCORPORATED,

       Plaintiffs,

       v.

FLORIDA POWER & LIGHT COMPANY,

       Defendant.

_____/

## COMPLAINT

NOW COME the Plaintiffs, by and through their undersigned counsel, and allege as follows:

### NATURE OF THE CASE

1.     This is a citizen suit, brought by the Southern Alliance for Clean Energy ("SACE") and Tropical Audubon Society Incorporated ("TAS"), pursuant to Section 505(a)(1) of the federal Clean Water Act ("CWA"), 33 U.S.C. § 1365(a)(1), to address violations of the CWA by Defendant Florida Power & Light Company ("FPL") resulting from the discharge of industrial wastewater containing pollutants from FPL's Turkey Point Power Plant near Homestead, Florida, into the protected waters of Biscayne Bay and to ground water, including the Biscayne Aquifer, in violation of the terms of National Pollutant Discharge Elimination System ("NPDES") Permit No. FL0001562 ("NPDES Permit") and the CWA.

2.     As set out in more detail herein, FPL has violated and continues to violate its NPDES Permit by unauthorized discharges of pollutants, including, but not limited to, excess

salinity, phosphorus, ammonia, TKN (Total Kjeldahl Nitrogen - a measurement of nitrogen levels), total nitrogen, and radioactive tritium, into waters of the United States in Biscayne Bay. Additionally, FPL has violated its NPDES Permit by discharges of hypersaline water contaminated with radioactive tritium into ground water, threatening the water supply for Miami-Dade County and the Florida Keys. FPL has also violated the CWA by discharging pollutants without an NPDES permit and by causing violations of water quality standards in Biscayne Bay, which is protected from degradation as Outstanding National Resource Waters and Outstanding Florida Waters.

## JURISDICTION

3.      This Court has subject matter jurisdiction over the CWA claims set forth in this Complaint pursuant to Section 505(a) of the CWA, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331.

4.      Plaintiffs have complied with the pre-suit notice provisions of the CWA.  Pursuant to Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), Plaintiffs, on March 15, 2016, mailed a notice of intent to file suit ("Notice") to address the CWA violations to FPL, the Administrator of the U.S. Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Florida Department of Environmental Protection ("FLDEP"), and the United States Attorney General [Attached hereto as Exhibit "A" and incorporated by reference herein].

5.      The Notice complied with 33 U.S.C. § 1365(b)(1)(A) and with 40 C.F.R. Part 135, Subpart A. More than 60 days have passed since the Notice was served on Defendant and the federal and state regulatory agencies.

6.      Neither EPA nor FLDEP has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a state to redress the violations of the CWA by Defendant FPL.

7.      EPA has not commenced an administrative civil penalty action under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

2

8.      Plaintiffs will, immediately upon receipt of a file stamped copy of this Complaint, mail a copy of this Complaint to the Administrator of the Environmental Protection Agency, the Regional Administrator of the EPA Region in which the violations are alleged to have occurred, and the Attorney General of the United States.

9.      Venue is appropriate in the Southern District of Florida, pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## PARTIES

10.      Plaintiff Southern Alliance for Clean Energy ("SACE") is a non-profit corporation organized under the laws of the State of Tennessee and qualified to do business in the State of Florida. SACE is a regional organization with the mission to promote responsible energy choices that create global warming solutions and ensure clean, safe and healthy communities throughout the Southeast.  To support this mission, SACE represents the interests of its members throughout the Southeast, including Florida, in public education, policy advocacy, and litigation in administrative and court proceedings. SACE's mission and activities include protection of water quality impacted by energy generation facilities, such as FPL's Turkey Point Power Plant.

11.      SACE has members who are injured by the violations alleged herein, including members who live, work, and/or recreate on Biscayne Bay near the FPL Turkey Point Power Plant and have environmental, recreational, property, economic, health, and aesthetic interests in these waters. SACE also has members who use drinking water supplied from the Biscayne Aquifer near the FPL Turkey Point Power Plant, who have property, economic, and health interests in these waters.

12.     Tropical Audubon Society Incorporated ("TAS") is a chapter of the National Audubon Society established in 1947 and incorporated in Florida in 1960. Its mission is to "conserve and restore South Florida's ecosystems, focusing on birds, other wildlife and their habitats for the benefit of humanity and the earth's biological diversity." More generally the purpose of TAS is (1) to protect natural resources and promote wise stewardship of those resources, including native plants, animals and their habitats; (2) promote through education an understanding and appreciation of nature, the environment, and ecological relationships; and (3) enjoy with its members and others the study and protection of nature. For more than 50 years Tropical Audubon has been actively advocating on behalf of its members who share an interest in improving, preserving and protecting the health and aesthetic qualities of the Everglades ecosystem, Biscayne Bay, Biscayne National Park, the Biscayne Bay Aquatic Preserve, Florida Keys National Marine Sanctuary, Card Sound, the wetlands adjacent to these waters and the wildlife which depend on these waters for their survival.

13.     TAS has a substantial number of members who recreate, use, observe wildlife and otherwise enjoy the Everglades, Biscayne Bay, Biscayne National Park, the Biscayne Bay Aquatic Preserve, Florida Keys National Marine Sanctuary, and Card Sound and the areas adjacent to these waters. These members share an interest in improving, preserving and protecting the natural ecological resources of these areas, including wildlife, and in improving water conservation, improving water quality and in the restoration of the historic Everglades. These TAS members are injured by the violations alleged herein, including members who live, work, and/or recreate on Biscayne Bay near the FPL Turkey Point Power Plant and have environmental, recreational, property, economic, health, and aesthetic interests in these waters. TAS also has members who use

4

drinking water supplied from the Biscayne Aquifer near the FPL Turkey Point Power Plant, who have property, economic, and health interests in these waters.

14.     FPL's unlawful discharges of industrial wastewaters containing pollutants into Biscayne Bay and into the Biscayne Aquifer and the violations of the NPDES Permit adversely affect the environmental, recreational, property, economic, health and aesthetic interests of members of SACE and TAS.

15.     These injuries will not be redressed except by an order from this Court assessing civil penalties against FPL and requiring FPL to take immediate and substantial action to stop the discharge of industrial wastewaters containing pollutants into the Biscayne Bay and the Biscayne Aquifer and to take permanent steps to prevent additional industrial wastewaters containing pollutants from being discharged from the FPL Turkey Point Power Plant in violation of the NPDES permit.

16.     Plaintiffs SACE and TAS are each a "citizen" within the meaning of 33 U.S.C. §§ 1365(g) and 1365(a).

17.     Defendant FPL is a for-profit corporation organized under the laws of Florida, which owns and operates the Turkey Point Power Plant, which is governed by NPDES Permit No. FL0001562.

18.     Defendant FPL is a "person" within the meaning of 33 U.S.C. §§ 1362(5) and 1365(a)(1).

## STATUTORY BACKGROUND

19.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source into waters of the United States unless the discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a)

prohibits such discharges not authorized by, or in violation of the terms of, an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342. Each violation of the permit, and each discharge that is not authorized by the permit, is a violation of the CWA and is enforceable under 33 U.S.C. § 1365(a).

20.     The State of Florida has been delegated the authority to implement the NPDES permit program of the CWA by EPA, pursuant to 33 U.S.C. § 1342(b). FLDEP is the state water pollution control agency for purposes of the CWA, and administers statutory and regulatory provisions implementing the CWA's permitting programs within the State of Florida. *See, e.g.*, Fla. Stat. §§ 403.087, 403.088.

21.     The CWA defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

22.     There is CWA jurisdiction where pollutants travel from a point source to navigable surface waters through hydrologically connected ground water. *See*, *e.g.*, 56 Fed. Reg. 64,876, 64,892 (Dec. 12, 1991); 66 Fed. Reg. 2960, 3015 (Jan. 12, 2001); 73 Fed. Reg. 70,418, 70,420 (Nov. 20, 2008).

23.     Federal courts have jurisdiction to hear citizen suits brought pursuant to state-issued NPDES permits, including for enforcement of more stringent provisions than would be included in a federal permit. *See*, *e.g*., *Parker v. Scrap Metal Processors, Inc*., 386 F.3d 993, 1004-08 (11th Cir. 2004).

24.     A citizen suit, pursuant to 33 U.S.C. § 1365(a)(1), may be brought for violations of the terms of NPDES permits, as well as for discharges of pollutants into waters of the United States without a valid NPDES permit. 33 U.S.C. § 1365(f).

## GENERAL ALLEGATIONS

### FPL Cooling Canal System

25.     FPL owns and operates the Turkey Point Power Plant, located on the shores of Biscayne Bay near Homestead, Florida, about 25 miles south of downtown Miami. The Plant includes two nuclear generation units, built in the early 1970's, called Turkey Point Units #3 and #4.

26.     In the early 1970's, as the result of a federal court order to stop discharging hot cooling water into Biscayne Bay from its two nuclear power generators and other units, FPL constructed a giant, 5,800-acre, two-miles-wide-by five-miles-long, unlined cooling canal system adjacent to Biscayne Bay with the requirement to recycle the cooling water to prevent all discharges to the Bay.

27.     The FPL cooling canal system is a "point source" under the CWA.

28.     Pursuant to authority delegated by the United States Environmental Protection Agency ("EPA") under section 402(b) of the CWA, 33 U.S.C. § 1342(b), the Florida Department of Environmental Protection ("FLDEP") issued NPDES permit number FL0001562 to FPL. The current version of the permit became effective May 6, 2005. The permit expired on May 5, 2010, but has been administratively extended by FLDEP.

29.     NPDES Permit No. FL0001562 authorizes the discharge of industrial wastewater, including non-contact once-through condenser cooling water (OTCW), auxiliary equipment cooling water (AECW), low-volume waste (LVW), and storm water into the cooling canal system.

The NPDES Permit specifically does not authorize the discharge of cooling canal system wastewater to surface waters. The NPDES Permit also contains limits on ground water discharges.

30.     Used cooling water and other industrial wastewaters from the Turkey Point Power Plant are discharged through a point source of discharge – the outfalls designated I-001 and I-002 in the plant's NPDES permit, from which they enter the FPL cooling canal system.  The FPL cooling canal system is permitted as an industrial wastewater facility designed to hold industrial wastewater from the Turkey Point nuclear reactors, and is confined and discrete.

31.     The cooling canal system is unlined and underlain by porous limestone geology, including the Biscayne Aquifer.  The contaminated water in the cooling canal system has for many years discharged, and continues to discharge, from the cooling canal system into Biscayne Bay through a direct hydrologic connection between the cooling canal system and the navigable in fact waters of Biscayne Bay.

32.     In 2012 and 2013, the two nuclear generators were "uprated" to increase power production, resulting in a much higher than predicted increase in the temperature and salinity of the water in the cooling canal system.

33.     As a result of the higher temperature and salinity in the cooling canal system, FPL began adding up to 100 million gallons per day of fresh water to the cooling canal system in 2014. The addition of this fresh water further pushed pollutants from the cooling canal system into the ground water and into Biscayne Bay.

## Biscayne Bay

34.     Biscayne Bay is the largest estuary on the coast of southeast Florida and is contiguous with the southern Florida Everglades and Florida Bay. It encompasses a marine ecosystem that totals approximately 428 square miles. Its drainage area is 938 square miles, of

which 350 are freshwater and coastal wetlands in Miami-Dade, Broward, and Monroe Counties. It is home to Biscayne National Park, the largest marine park in the national park system. Not only is it a source for food, transportation, and commerce, it also offers boundless opportunities for recreation, such as boating, fishing, swimming, snorkeling and scuba diving. Rimmed by mangrove wetlands, the natural bay is a shallow estuary of clear waters and sandy bay bottoms with seagrasses, corals and sponges. The bay supports rich ecological communities and a diverse variety of fish and wildlife.

35.     Biscayne Bay is waters of the United States.

36.     Pursuant to the authority delegated to it under the CWA, FLDEP has promulgated water quality standards for surface waters within the state. The waters of Biscayne Bay into which FPL is discharging are classified by FLDEP in Rule 62-302.400(14) of the Florida Administrative Code ("F.A.C.") as Class III – Recreation, Propagation and Maintenance of a Healthy, Well-Balanced Population of Fish and Wildlife.

37.     In addition, Rule 62-302.700(9), F.A.C., designates the waters of Biscayne Bay within Biscayne National Park into which FPL is discharging as Outstanding National Resource Waters and Outstanding Florida Waters. Pursuant to Rule 62-302.700(1), F.A.C., "[i]t shall be the Department policy to afford the highest protection to Outstanding Florida Waters and Outstanding National Resource Waters. No degradation of water quality . . . is to be permitted in Outstanding Florida Waters and Outstanding National Resource Waters."

38.     The narrative nutrient criterion in Rule 62-302.530(47)(b), F.A.C., has been interpreted by FLDEP as requiring no more than 0.007 milligram per liter ("mg/L") of Total Phosphorus, 0.35 mg/L of Total Nitrogen, and 0.2 µg/L of Chlorophyll $a$, in the waters of Biscayne Bay into which FPL is discharging. Rule 62-302.532(1), F.A.C. In addition, Sec. 24-42(4) of the

Miami-Dade County, Florida, Code of Ordinances, requires 0.5 mg/L or less of ammonia in marine waters in the County.

### Biscayne Aquifer and Ground Water Quality

39.     The Biscayne Aquifer is the main source of potable water in Miami-Dade County and the Florida Keys and is designated by the federal government as a sole source aquifer under the Safe Drinking Water Act.

40.     FLDEP classifies ground water according to its potential use, including the following:

Class G-I: Potable water use, ground water in a single source aquifer that has a total dissolved solids content of less than 3,000 mg/L and was specifically reclassified by the Commission;

Class G-II:  Potable water use, ground water in aquifers with a total dissolved solids content of less than 10,000 mg/L, unless otherwise classified by the Commission;

Class G-III: Non-potable water use, ground water in unconfined aquifers with a total dissolved solids content of 10,000 mg/L or greater; or with a total dissolved solids content of 3,000-10,000 mg/L and either has been reclassified by the Commission as having no reasonable potential as a future source of drinking water, or has been designated by the Department as an exempted aquifer pursuant to subsection 62-528.300(3), F.A.C.

41.     FLDEP sets minimum standards for ground water in Rule 62-520.400, FA.C. and 62-520.430, FA.C. Rule 62-520.400, F.A.C., states:

1.     All ground water shall at all places and at all times be free from domestic, industrial, agricultural, or other man-induced non-thermal components of discharges in concentrations which, alone or in combination with other substances, or components of discharges (whether thermal or non-thermal):
(a)     Are harmful to plants, animals, or organisms that are native to the

soil and responsible for treatment or stabilization of the discharge relied upon by Department permits; or

(b)    Are carcinogenic, mutagenic, teratogenic, or toxic to human beings, unless specific criteria are established for such components in Rule 62-520.420, F.A.C.; or

(c) Are acutely toxic within surface waters affected by the ground water; or

(d) Pose a serious danger to the public health, safety, or welfare; or

(e) Create or constitute a nuisance; or

(f) Impair the reasonable and beneficial use of adjacent waters.

These standards apply to all ground water, including ground water classified as G-III ground water.

42.    For specific components, Rules 62-520.420, 62-550.310, and 62-550.828, F.A.C., establish specific ground water standards for G-III ground water and G-II ground water, including standards for sodium (160 mg/L), nitrate (10 mg/L), chlorides (250 mg/L), sulfates (250 mg/L), and tritium (20,000 pCi/L).

43.    Tritium is produced by nuclear reactors and is often found as a ground water contaminant at nuclear power plants. Elevated tritium levels have been found in the FPL cooling canal system for many years. Historical data from 1974 to 1975 showed tritium concentrations in the FPL cooling canal system to be in the range of 1,556 – 4,846 pCi/L, and reports submitted by FPL for the monitoring period from June 2010 through December 2015 showed cooling canal system tritium concentrations as high as 15,487 pCi/L. Tritium is a good tracer to show discharge of contaminated water with other pollutants from the cooling canal system.

44.    Tritium, like other radionuclides, is considered to be a carcinogen. Tritium, as tritiated water, enters the body and distributes widely through all water containing compartments without concentrating in any one site. Tritium then readily exchanges with hydrogen in many body molecules, including ribonucleotides, proteins and others, thereby being in the position to impart its energy upon critical molecules. For example, tritium incorporated into DNA may result in beta particle radiation altering chromosomes, allowing for the induction of cancer. Tritium has a

11

Maximum Contaminant Level ("MCL") for drinking water of 20,000 pCi/L, but the public health goal is much lower. An MCL takes into account factors other than public health, including feasibility of treatment and economics. EPA has not set a public health goal for tritium in drinking water, but the State of California, based on EPA risk factors, has established the public health goal at 400 pCi/L, which is equivalent to a 1-in-a-million lifetime cancer risk.

## CLAIMS: CLEAN WATER ACT VIOLATIONS

## COUNT 1: VIOLATIONS OF EFFLUENT LIMITATIONS IN NPDES PERMIT NO. FL0001562

45. Plaintiffs incorporate all prior paragraphs as if restated herein.

Condition I.A.1.

46. Condition I.A.1. of the NPDES Permit states: "[t]his permit does not authorize discharge to surface waters of the state." FPL has violated this effluent limitation repeatedly since at least June 2015, and continues to violate this limitation, by discharging wastewater from the cooling canal system containing pollutants (phosphorus, ammonia, TKN, total nitrogen, radioactive tritium) into Biscayne Bay through a direct hydrological connection between the ground water impacted by the cooling canal system and Biscayne Bay. These violations have been documented based on the detection of the pollutants in monitoring by FPL and the Miami-Dade Division of Environmental Resources Management ("DERM") since 2010. Due to the contamination of the water in the cooling canal system and the ground water below and surrounding the canal system, the violations have been continuous for at least the past five (5) years and will likely continue after the date of this Complaint unless the source of the contamination is removed and the ground water is cleaned up.

47. FPL has been discharging wastewater from the cooling canal system containing pollutants into Biscayne Bay for more than five (5) years. FPL began monitoring the surface

waters of Biscayne Bay and surface waters connected to Biscayne Bay in 2010, pursuant to an agreement with the South Florida Water Management District ("SFWMD"). Monitoring results showing pollutants (ammonia, phosphorus, TKN, total nitrogen, and tritium) from the canal system in the surface waters of Biscayne Bay at Surface Water Monitoring Stations TPBBSW-1 through 5 (Biscayne Bay stations), TPSWC-1 through 3 (L-31E Canal stations), TPSWC-4 (S-20 Discharge Canal), TPSWC-5 (Card Sound Canal), and TPSWC-6 (Card Sound Road Canal) were reported for June-July 2010, September 2010, December 2010, March 2011, June 2011, September 2011, December 2011, March 2012, June 2012, September 2012, December 2012, March 2013, June 2013, September 2013, December 2013, March 2014, September 2014, and March 2015. The discharges of wastewater into Biscayne Bay are continuing as of the date of this Complaint.

48.     DERM and FPL began monitoring near-shore surface waters of Biscayne Bay adjacent to the cooling canal system more intensively in June 2015. Monitoring results showing pollutants (ammonia, phosphorus, TKN, total nitrogen, and chlorophyll *a*) from the canal system in surface waters of the Bay at Surface Water Monitoring Stations TPSWC-4B, TPSWC-5B TPBBSW-6 and TPBBSW-7 were reported for May 31 & Jun 1, 2015, June 15 & 16, 2015, June 29 & 30, 2015, July 13 & 14, 2015, July 20 & 21, 2015, July 27 & 28, 2015, August 3 & 4, 2015, August 10 & 11, August 17 & 18, 2015, August 24 & 25, 2015, August 31 to September 2, 2015, September 8 & 9, 2015, September 14 & 18, 2015, September 21 & 22, 2015, September 28 to October 2, 2015, October 5 to 7, 2015, October 19 & 20, 2015, October 26 & 27, 2015, November 2 & 4, 2015, November 9 to 13, 2015, November 16 to 19, 2015, November 23 & 24, 2015, November 30 to December 3, 2015, December 7 to 9, 2015, December 14 & 15, 2015, December 21 & 22, 2015, December 28 & 29, 2015, January 4 & 5, 2016, January 11 & 12,  2016, and January 18 & 19, 2016. These discharges of wastewater into Biscayne Bay are continuing as of

the date of this Complaint.

49.     In addition, DERM and FPL sampled near-shore surface waters of Biscayne Bay adjacent to the cooling canal system at Surface Water Monitoring Stations TPBBSW-7-B, TPBBSW-7M-B, TPBBSWCSC-M-B, TPSWC-7B, TPBBSW-6B, and TPBBSW-7T-B for radioactive tritium in December 2015 and January 2016. The results showed high levels of tritium (245 to 4,317 pCi/L) in deeper near-shore waters. Levels of tritium in Biscayne Bay away from the cooling canal system are typically less than 20 pCi/L. The presence of high levels of tritium in the near-shore surface waters of Biscayne Bay also confirms the hydrologic connection between the canal system and the surface waters of Biscayne Bay.

50.     The levels of pollutants (ammonia, phosphorus, TKN, total nitrogen, chlorophyll $a$, and tritium) found in Biscayne Bay as a result of FPL's wastewater discharges from its cooling canal system represent degradation of the waters of Biscayne Bay, in violation of the "no degradation" requirement stemming from the designation of these waters as Outstanding National Resource Waters and Outstanding Florida Waters. In addition, the monitoring performed demonstrates that the levels of pollutants violate the Miami-Dade County water quality standard for ammonia and violate Florida water quality standards for total nitrogen, phosphorus, and chlorophyll $a$. The degradation of the waters of Biscayne Bay is continuing as of the date of this Complaint.

Condition I.A.14 of the NPDES Permit

51.     Condition I.A.14 of the NPDES Permit states:

Notwithstanding any other requirements of this "No Discharge" permit, the permittee shall comply with all applicable provisions of the Final Judgement dated September 10, 1971, in Civil Action Number 70-328-CA issued by the U.S. District Judge C. Clyde Atkins of the Southern District of Florida.

FPL has violated Paragraph V of this Final Judgment by discharging wastewater from the cooling

canal system into Biscayne Bay, as set out in Paragraphs 46-50 of this Complaint, *supra*. The violations are continuing as of the date of this Complaint.

Condition IV.1. of the NPDES Permit

52.     Condition IV.1. of the NPDES Permit states: "The Permittee's discharge to ground water shall not cause a violation of the minimum criteria for ground water specified in Rule 62-520.400, FA.C. and 62-520.430, FA.C." This condition also serves to protect surface waters from degradation in areas near the cooling canal system where the ground water is hydrologically connected to surface waters.

53.     FPL has violated Condition IV.1. by causing continuous violations of the minimum criteria for ground water during each day during the past five (5) years preceding this Notice. Due to the contamination of the water in the cooling canal system and the ground water below and surrounding the canal system, the violations will likely continue after the date of this Complaint unless the source of the contamination is removed and the ground water is cleaned up.

54.     FPL has contaminated ground water extending from the cooling canal system to over four (4) miles west of the cooling canal system in violation of Condition IV.1. of the NPDES Permit. Monitoring wells west of the FPL cooling canal system have shown violations of the minimum criteria for ground water since at least 2009, including sodium levels in well G-21 and G-28, approximately 4 miles west of the cooling canal system, which exceed sodium criterion by as much as 50 times. Other wells west of the cooling canal system (BBCW- 4, BBCW-5, FKS-4, TPGW-5D) showed sodium levels as high as 100 times the criterion. These violations are continuing as of the date of this Complaint.

55.     FPL's hypersaline plume in the area west of the cooling canal system has impaired and is impairing the reasonable and beneficial use of adjacent G-II ground water and, therefore, is

a violation of the minimum criteria for ground water in Rule 62-520.400, F.A.C. The continuous seepage and resulting ground water plume of contaminated cooling canal wastewater has contaminated and continues to contaminate usable portions of the Biscayne Aquifer - steadily converting Class G-II potable water to Class G-III non-potable water as it moves west through the Biscayne Aquifer. These violations are continuing as of the date of this Complaint.

56.     In addition, the plume of radioactive tritium continues to move west of the cooling canal system into the Biscayne Aquifer, with levels exceeding the public health goal of 400 pCi/L as much as three (3) miles west of the cooling canal system.

Condition VIII.5. of the NPDES Permit

57.     Condition VIII.5 of the NPDES Permit states:

The permittee shall take all reasonable steps to minimize or prevent any discharge, reuse of reclaimed water, or residuals use or disposal in violation of this permit which has a reasonable likelihood of adversely affecting human health or the environment. It shall not be a defense for a permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this permit. [62-620.610(5), F.AC.]

58.     FPL has violated and continues to violate this condition by, among other omissions, failing to take all reasonable steps to minimize or prevent the discharges to surface waters and ground water set out in this Complaint. These discharges, which contain pollutants, such as high salinity, total nitrogen, total phosphorous, ammonia, and tritium, have a reasonable likelihood of adversely affecting human health or the environment.

Condition VIII.7. of the NPDES Permit

59.     Condition VIII.7. of the NPDES Permit states:

The permittee shall at all times properly operate and maintain the facility and systems of treatment and control, and related appurtenances, that are installed and used by the permittee to achieve compliance with the conditions of this permit. This provision includes the operation of backup or auxiliary facilities or similar systems when necessary to maintain or achieve compliance with the conditions of the

permit. [62-620.610(7), F.A C.]

60.    FPL has violated and continues to violated this condition by, among other omissions, failing to adequately control the temperature of the cooling water in the cooling canal system, by failing to control the nutrient levels in the system, and by failing to properly operate the so-called "interceptor" ditch to prevent widespread contamination of the ground water by saline water and other pollutants, including radioactive tritium.

Relief Requested

61.    Defendant FPL should be subject to an enforcement order or injunction ordering FPL to cease its violations of the NPDES Permit.

62.    Defendant FPL should be subject to the assessment of civil penalties for these permit violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d) and 1365.

63.    For the purpose of assessing the maximum penalty which Defendant FPL is liable, each day that FPL has violated its NPDES Permit constitutes a separate violation of Section 301(a) of the CWA, pursuant to Section 309(d), 33 U.S.C. § 1319(d), for each day on which it has occurred or will occur after the filing of this Complaint.

**COUNT 2: DISCHARGING POLLUTANTS TO SURFACE WATERS
WITHOUT AN NPDES PERMIT**

64.    Plaintiffs incorporate all prior paragraphs as if restated herein.

65.    Since at least June 2010, FPL has violated the CWA, 42 U.S.C. § 1311(a) and 40 C.F.R. § 122.21, by discharging industrial wastewater containing pollutants (phosphorus, ammonia, TKN, total nitrogen, radioactive tritium) into Biscayne Bay through a direct hydrological connection between the ground water impacted by the cooling canal system and Biscayne Bay without an NPDES permit authorizing such discharges. The locations of the discharges are set out in Count 1 of this Complaint, *supra*.  The requirement for an NPDES permit

authorizing these discharges arose at the time that FPL first knew or should have known that industrial wastewater from the cooling canal system was being discharged into surface waters. Each day since that time is a violation of the CWA, and the violations are continuing as of the date of this Complaint.

66.     Defendant FPL should be subject to an enforcement order or injunction ordering FPL to cease its discharges of industrial wastewater from the cooling canal system without an NPDES permit authorizing such discharges.

67.     Defendant FPL should be subject to the assessment of civil penalties for these violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d) and 1365.

68.     For the purpose of assessing the maximum penalty which Defendant FPL is liable, each day that FPL has discharged pollutants without a permit authorizing such discharges constitutes a separate violation of Section 301(a) of the CWA, pursuant to Section 309(d), 33 U.S.C. § 1319(d), for each day on which it has occurred or will occur after the filing of this Complaint.

### COUNT 3: DISCHARGES CAUSING OR CONTRIBUTING TO VIOLATIONS OF WATER QUALITY STANDARDS

69.     Plaintiffs incorporate all prior paragraphs as if restated herein.

70.     Federal and state law prohibit discharges of pollutants from point sources that cause or contribute to violations of surface water quality standards. *See, e.g.*, 33 U.S.C. § 1311(b)(1)(C) and § 403.088(1), Fla. Stat. In addition to prohibiting discharges to surface waters altogether, the NPDES Permit requires compliance with water quality standards in Section VIII., Paragraphs 5 and 12. FPL has violated the CWA, Florida law, and the NPDES Permit by causing or contributing to violations of surface water quality standards in Biscayne Bay due to its discharges from the Turkey Point cooling canal system, as set out in Count 1 of this Complaint, *supra*, including, but

not limited to, the narrative nutrient criterion in Rule 62-302.530(47)(b), F.A.C., and the water quality standard for ammonia in Sec. 24-42(4) of the Miami-Dade County, Florida, Code of Ordinances. These violations began in 2010 and continue as of the date of this Complaint, as shown by monitoring data generated by FPL and DERM.

71.     The levels of pollutants (ammonia, phosphorus, TKN, total nitrogen, chlorophyll *a*, and tritium) found in Biscayne Bay as a result of FPL's discharges from its cooling canal system also represent degradation of the waters of Biscayne Bay, in violation of the "no degradation" requirement stemming from the designation of these waters as Outstanding National Resource Waters and Outstanding Florida Waters.

72.     Defendant FPL should be subject to an enforcement order or injunction ordering FPL to cease its discharges of pollutants which are causing violations of water quality standards and degradation of Outstanding National Resource Waters and Outstanding Florida Waters.

73.     Defendant FPL should be subject to the assessment of civil penalties for these violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d) and 1365.

74.     For the purpose of assessing the maximum penalty which Defendant FPL is liable, each day that FPL has discharged pollutants which have caused violations of water quality standards and degradation of Outstanding National Resource Waters and Outstanding Florida Waters constitutes a separate violation of Section 301(a) of the CWA, pursuant to Section 309(d), 33 U.S.C. § 1319(d), for each day on which it has occurred or will occur after the filing of this Complaint.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

a.  Enter a declaratory judgment that Defendant FPL has violated and is in violation of effluent standards or limitations in its NPDES Permit and has violated and is in violation of the CWA, 33 U.S.C. §§ 1311(a) and 1342;

b.  Order or Enjoin Defendant FPL to abate the discharge of industrial wastewater containing pollutants from the cooling canal system into waters of the United States in violation of its NPDES Permit or without an NPDES Permit;

c.  Order or Enjoin Defendant FPL to remediate the pollutants that have migrated from the cooling canal system into Biscayne Bay and the ground water surrounding the cooling canal system;

d.  Order or Enjoin Defendant FPL to mitigate the damages caused by the migration of pollutants into Biscayne Bay and the ground water surrounding the cooling canal system;

e.  Order Defendant FPL to comply with all terms and conditions of its NPDES Permit;

f.  Order Defendant FPL to pay civil penalties of up to thirty-seven thousand five hundred dollars ($37,500) per day for each day of each violation of the CWA set out in this Complaint, pursuant to Sections 309(d) and 505(a) of the CWA, 33 U.S.C. § 1319(d) and 1365(a);

g.  Award Plaintiff its costs, including reasonable attorney and expert witness fees, as authorized by Section 505(d) of the CWA, 33 U.S.C. § 1365(d); and

h.  Grant such other and further relief as the Court deems just and appropriate.

Respectfully submitted, this the 12th day of July, 2016.

/s/ James M. Porter
James M. Porter (Fla. Bar No. 443329)
JAMES M. PORTER, PA
9350 South Dixie Highway
10th Floor
Miami, Florida 33156
Tel: (305) 671-1345
Jim@JamesMPorterPA.com

Gary A. Davis (N.C. Bar No. 25976) (*admission pro hac vice requested*)
James S. Whitlock (N.C. Bar No. 34304) (*admission pro hac vice requested*)
DAVIS & WHITLOCK, P.C.
21 Battery Park Avenue
Suite 206
Asheville, NC 28801
(828) 622-0044
(828) 398-0435
gadavis@enviroattorney.com
jwhitlock@enviroattorney.com

Counsel for Plaintiffs