**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

**Case No.: 1:16-cv-23017-DPG**

SOUTHERN ALLIANCE FOR CLEAN ENERGY,
TROPICAL AUDUBON SOCIETY INCORPORATED,
and FRIENDS OF THE EVERGLADES, INC.,

     Plaintiffs,

     v.

FLORIDA POWER & LIGHT COMPANY,

     Defendant.

_____/

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT FLORIDA POWER & LIGHT COMPANY'S MOTION TO DISMISS

### INTRODUCTION

In crafting the Clean Water Act ("CWA" or "Act") Congress explicitly dealt with the situation in this case, where state administrative enforcement action is commenced and concluded after notice of a citizen suit is filed. Congress was clear in 33 U.S.C. § 1319(g)(6)(B)(ii) that a state administrative order does not bar a citizen suit where the notice of citizen suit is filed before commencement of the state administrative action and the citizen suit is filed within 120 days after the notice. Instead of acknowledging the effect of this provision, Defendant Florida Power & Light Company ("FPL") asks this Court to distort the doctrine of standing into an additional, and inappropriate, bar on citizen suits.

Plaintiffs agree that they must have standing to file suit, including the element of redressability, but FPL cannot cite a single case, much less a case from the Eleventh Circuit, which

has dismissed a CWA citizen suit brought under similar circumstances based on a lack of standing. Pursuant to well-established law, Plaintiffs have standing because they have alleged injury in fact, causation, and redressability. FPL has challenged only the element of redressability, and, in response to this Fed. R. Civ. P. 12(b)(1) factual attack, Plaintiffs have provided ample evidence that FPL's CWA violations existed at the time of their Complaint, that these violations are ongoing, that the administrative enforcement actions taken by the Florida Department of Environmental Protections ("FDEP") and Miami-Dade County have not brought FPL into compliance and will not likely bring FPL into compliance in the future.. Accordingly, the Court should deny FPL's motion to dismiss, and its related motion to stay, and this case should proceed to discovery in the normal course in accordance with a Scheduling Order to be entered by the Court.

## STATEMENT OF THE FACTS

**A.  FPL's Cooling Canal System and the Violations of the Clean Water Act.**

FPL owns and operates the Turkey Point Power Plant, located on the shores of Biscayne Bay near Homestead, Florida, about 25 miles south of downtown Miami. [Doc. 32, ¶ 29]. The Plant includes two nuclear generation units, built in the early 1970's, called Turkey Point Units #3 and #4. *Id*.

In the early 1970's, FPL constructed a giant, 5,800-acre, two-miles-wide-by five-miles-long, unlined cooling canal system adjacent to Biscayne Bay with the requirement to recycle the cooling water and to prevent all discharges to the Bay. *Id*., ¶ 30. Pursuant to authority delegated by the United States Environmental Protection Agency ("EPA") under the CWA, FDEP issued NPDES permit number FL0001562 to FPL. *Id*., ¶ 32. The current version of the permit became effective May 6, 2005. NPDES Permit No. FL0001562 authorizes the discharge of industrial wastewater, including non-contact once-through condenser cooling water (OTCW), auxiliary

equipment cooling water (AECW), low-volume waste (LVW), and storm water into the cooling canal system.  *Id*., ¶ 33.  The NPDES Permit specifically does not authorize the discharge of cooling canal system wastewater to surface waters.  *Id*.  The NPDES Permit also contains limits on ground water discharges.  *Id*.

The cooling canal system is unlined and underlain by porous limestone geology, including the Biscayne Aquifer.  *Id*., ¶ 35.  The cooling canal system has discharged contaminated water into the Biscayne Aquifer for many decades, substantially contributing to the westward intrusion of hypersaline and contaminated water into the Aquifer over an area that extends miles westward of the cooling canal system.  *Id*.  The Amended Complaint identifies precise locations where the groundwater limits in the NPDES Permit have been and continue to be violated.  *Id*., ¶ 61.

The contaminated water in the cooling canal system also has for many years discharged, and continues to discharge, from the cooling canal system into Biscayne Bay through a direct hydrologic connection between the cooling canal system and the waters of Biscayne Bay.  *Id*., ¶ 35.  The Amended Complaint identifies several locations in Biscayne Bay where the discharges have been and continue to be detected.  *Id*., ¶¶52-54.

**B.     The Timing of Plaintiffs' Sixty-Day Notice and the Administrative Proceedings Commenced by FDEP.**

FPL's Motion to Dismiss attaches and references three different administrative actions which FPL claims have totally redressed FPL's CWA violations as of the filing of Plaintiffs' Complaint.  [Docs. 38-1, 38-2, 38-4].  Neither the FDEP 2014 Administrative Order, nor the Miami-Dade County Division of Environmental Resources Management ("DERM") Consent Agreement addressed violations of the Clean Water Act or FPL's NPDES Permit.  [Docs. 38-2, 38-4].  As a matter of record, the Administrative Law Judge, who heard the appeal of the FDEP 2014 Administrative Order ("AO") found in his February 15, 2016, Recommended Order,"[t]he

3

AO is not a reasonable exercise of DEP's enforcement discretion because FPL has not been charged with violations of law," and "DEP does not require FPL to come into compliance with standards or specify a reasonable time for FPL to come into compliance." *See* Recommended Order at ¶ 92-93, attached as Ex. 1.  The DERM Consent Agreement addresses only violations of the ammonia limits contained in DERM rules and does not address compliance with the CWA or FPL's NPDES Permit.  [Doc. 38-2].

Only the FDEP Consent Order, entered on June 20, 2016, ninety-seven days after Plaintiffs' 60-day Citizen Suit Notice, addressed any violations of FPL's NPDES Permit. That Consent Order did not allege any violations regarding illegal discharges into Biscayne Bay or require any remedies that are likely to result in compliance with the FPL NPDES Permit or the Clean Water Act.  [Doc. 38-1].

After the FDEP 2014 AO failed to address any violations of the Clean Water Act and the Administrative Law Judge found it was not a reasonable exercise of FDEP's enforcement discretion, on March 15, 2016, Plaintiffs Southern Alliance for Clean Energy ("SACE") and Tropical Audubon Society ("TAS") served a 60-day citizen suit notice, pursuant to 33 U.S.C. § 1365(b)(1)(A). This Notice alleged multiple violations of the CWA by FPL arising out of discharges of pollutants from FPL's cooling canal system for its Turkey Point Power Plant, and the resulting pollution of Biscayne Bay to the east, as well as the Biscayne Aquifer to the west. [Doc. 1-3].

Over one month later, on April 25, 2016, FDEP sent a Notice of Violation (NOV) to FPL concerning the pollution spreading west into the Biscayne Aquifer.  [Doc. 38-9].  This Notice of Violation mentioned the requirements of the FPL NPDES Permit regarding groundwater pollution, but did not address the illegal discharge of pollutants into Biscayne Bay.  *Id.*  On the same day,

FDEP also issued a "Warning Letter" to FPL concerning evidence that polluted groundwater is reaching Biscayne Bay through artificial channels immediately adjacent to FPL's cooling canal system, but did not mention that such discharges to Biscayne Bay were violations of FPL's NPDES Permit.  [Doc. 38-8].  This "Warning Letter" merely sought "any facts [FPL] may have that will assist in determining whether any violations of [Florida law] have occurred." *Id*.

On June 20, 2016, without any administrative proceedings, FDEP and FPL entered into an administrative Consent Order "to address the violations alleged in the NOV and issues raised in the Warning Letter."  [Doc. 38-1, ¶ 16].  Notably, FDEP never has alleged or resolved violations of the CWA or Florida law based on the discharges from FPL's cooling canal system into Biscayne Bay. *Id*.

On July 12, 2016, plaintiffs SACE and TAS filed a complaint in this Court that alleged the violations of the Clean Water Act outlined in their 60-day notice.  [Doc. 1]  This complaint was filed 119 days after the 60-day notice.

On July 13, 2016, plaintiffs served a supplemental 60-day notice that alleged further ongoing violations of the CWA and added Friends of the Everglades ("Friends") as a party giving notice.  [Doc. 32-1]  On October 11, 2016, Plaintiffs filed an Amended Complaint that included the CWA violations alleged in the supplemental 60-day notice.  [Doc. 32].  This Amended Complaint relates back to the date of the original Complaint and is the operative Complaint for consideration of Defendant's Motion to Dismiss.

**C.   Comparison of Violations Addressed in the FDEP Consent Order to Those Alleged in the Amended Complaint.**

        1.   <u>Approach to Discharges of Contaminated Water Into Biscayne Bay from the FPL Cooling Canal System</u>.

FDEP has alleged no violations of the CWA or Florida law related to the Defendant's discharges of contaminated water from its cooling canal system into Biscayne Bay.  Instead, FDEP sent a "Warning Letter" that sought further information, and the Consent Order purported to address "issues" raised in the "Warning Letter."  [Doc. 38-1, ¶¶ 15-16].  In addition, the Consent Order erroneously stated that the Defendant's CWA permit does not authorize "direct" discharges to surface waters.  *Id*., ¶ 4.  Accordingly, the objective of the Consent Order is to prevent only those releases of groundwater into Biscayne Bay that result in exceedances of surface water quality standards (not all discharges), and to achieve this goal, the Consent Order relies on projects only in two locations where discharges have been found, the Turtle Point Canal and Barge Basin Areas. *Id*., ¶ 19.

In contrast, the Amended Complaint correctly stated that the Defendant's CWA permit does not authorize <u>any</u> discharge from the cooling canal system to surface waters of the state. The word "direct" does not appear in the permit, nor does the prohibition on discharges require violations of surface water quality standards to constitute a violation of the permit.  [Doc. 32, ¶ 51].[1]  The Amended Complaint alleged repeated violations of this condition since at least 2010, and provided detailed allegations concerning the multiple monitoring stations in Biscayne Bay that have detected discharges from FPL's cooling canal system, including monitoring stations geographically separated from the two locations addressed by the Consent Order, the Turtle Point Canal and Barge Basin areas.  *Id*., ¶¶ 52-54.

The Amended Complaint alleges violations of other conditions of the FPL NPDES Permit and the CWA that are not included in the Consent Order: (1) violations of Condition I.A.14

---

[1] The exact language of the permit is "[t]his permit does not authorize discharge to surface waters of the state."  Permit, Condition I.A.1.  A copy of the FPL NPDES Permit is attached to this Memorandum as Ex. 2.

requiring compliance with all applicable provisions of the Final Judgement dated September 10, 1971, in Civil Action Number 70-328-CA issued by the U.S. District of the Southern District of Florida [*id*., ¶ 57]; (2) Condition VIII.5 requiring FPL to take all reasonable steps to minimize or prevent any discharge, reuse of reclaimed water, or residuals use or disposal in violation of this permit which has a reasonable likelihood of adversely affecting human health or the environment [*id*., ¶ 63]; (3) Condition VIII.7., which requires FPL to properly operate and maintain the facility and systems of treatment and control, and related appurtenances, that are installed and used by the permittee to achieve compliance with the conditions of this permit [*id*, ¶ 65]; (4) violations of the CWA, 42 U.S.C. § 1311(a) and 40 C.F.R. § 122.21, by discharging industrial wastewater containing pollutants (phosphorus, ammonia, TKN, total nitrogen, radioactive tritium) into Biscayne Bay without an NPDES permit authorizing such discharges [*id*., ¶ 71]; and (5) discharges of pollutants from point sources that cause or contribute to violations of surface water quality standards in violation of 33 U.S.C. § 1311(b)(1)(C) and § 403.088(1), Fla. Stat. [*id*., ¶ 76].

Finally, the Amended Complaint also alleged that the Miami-Dade Division of Environmental Resources Management ("DERM") has detected additional upwelling's of groundwater into Biscayne Bay, and that these further upwelling's constitute additional illegal discharges of polluted water from the cooling canal system into Biscayne Bay. *Id*., ¶ 55.

## 2.   Approach to CWA Violations in the Biscayne Aquifer.

The Consent Order was based on the FDEP Notice of Violation, and therefore addresses only the violations alleged in the NOV.   [Doc. 38-1, ¶ 16].  The NOV alleged that FPL's cooling canal system was the major contributing cause to the continued westward movement of hypersaline water into the Biscayne Aquifer, that this saltwater intrusion was impairing the reasonable and beneficial use of adjacent G-II groundwater. *Id*., ¶ 14.  Accordingly, the objective of the Consent

7

Order is to cease the discharges that impair the adjacent G-II ground waters to the west.  *Id*., ¶ 19.

To achieve this goal, FPL is required to take steps that may or may not be effective over the next

3 to 10 years.  *Id*., ¶¶ 19, 20a, 20c.

In contrast, the Amended Complaint alleged detailed violations of the minimum criteria

for groundwater in the Biscayne Aquifer, including the criterion for sodium, that have existed since

at least 2009 at specific locations up to four miles west of the cooling canal system, .  [Doc. 32, ¶

60].  The Amended Complaint also alleged impairment of the beneficial uses of G-II groundwater

at specific locations in the Biscayne Aquifer, including impairment by radioactive tritium.  *Id*., ¶

61.  The Amended Complaint also alleges in ¶ 49:

> … The Consent Order will not eliminate each of the violations of the NPDES
> Permit or the CWA alleged herein and will not preclude further violations of the
> NPDES Permit or the CWA, nor will it bring the cooling canal system into
> compliance with the NPDES Permit and with the CWA. The Consent Order
> primarily relies on the development of plans, and further actions to be implemented
> pursuant to those plans, which will take years to design and implement before
> having any potential effect. The only way to eliminate the ongoing discharge and
> pollution is for FPL to eliminate use of the cooling canal system and to construct
> mechanical draft cooling towers for Turkey Point Units 3 and 4.

3.     Civil Penalties.

The Consent Order imposed no civil penalties.  In contrast, the Amended Complaint seeks

civil penalties for all of the CWA violations alleged.  [Doc. 32, ¶¶ 68-69, 73-74, 79-80].

**D.     The Consent Order Has Not Stopped and Will Not Stop the Ongoing CWA Violations.**

Plaintiffs' Amended Complaint alleges that the FDEP Consent Order has not stopped and

will not stop the ongoing CWA violations by FPL.  *Id*., ¶ 49.  In further response to FPL's factual

challenge to this Court's jurisdiction, Plaintiffs have provided two declarations of experts in

relevant fields to support these allegations and refute FPL's assumption that the Consent Order has

somehow stopped the ongoing violations complained of. W. Kirk Martin in an expert in

8

groundwater hydrology, with extensive experience in Florida groundwater issues and studies. *See* Declaration of W. Kirk Martin, attached as Ex. 3. Bill Powers is a mechanical engineer with extensive experience in the evaluation of cooling systems for power plants, including nuclear power plants. *See* Declaration of Bill Powers, attached as Ex. 4.

First, Mr. Martin points out that the that Consent Order will result in backfilling only at the Turtle Basin Canal and Barge Basin Canal, and does not address the continued discharges into and contamination of Biscayne Bay at several other locations described in the Amended Complaint, including numerous natural hydrologic connections. Exhibit 3, ¶¶ 8-9. Second, Mr. Martin describes the flaws in the groundwater model developed by FPL and accepted by FDEP as the basis for the remedy selected in the Consent Order. *Id*., ¶ 10. Mr. Martin detailed these flaws, and described how other experts in Florida groundwater hydrology concur in finding multiple flaws in FPL's Model. *Id*., ¶ 11. Because of these flaws, serious questions exist whether the remedial actions proposed by FPL and FDEP will stop the continued flow of contaminated water from the cooling canal system into the groundwater and into the surface waters of Biscayne Bay, and whether these actions will remedy the CWA violations alleged in the Amended Complaint. *Id*., ¶ 12.

Finally, Mr. Powers makes it clear that the Consent Order fails to require the only certain remedy for the CWA violations, which is the elimination of the leaking Cooling Canal System altogether. Exhibit 4. His report demonstrates that a mechanical draft cooling tower system to replace the CCS is technically feasible and economically reasonable as compared to the uncertain band-aids for the ongoing violations in the Consent Order. *Id*. Plaintiffs' explicitly seek this permanent remedy in their Amended Complaint. [Doc. 32, ¶¶ 49, 67, 72, 78, Relief Requested b].

## **ARGUMENT**

I.  **CONGRESSIONAL INTENT, AS EXPRESSED IN 33 U.S.C. § 1319(g)(6)(B)(ii), IS FOR CWA CITIZEN ENFORCEMENT CASES, SUCH AS THIS, TO PROCEED NOTWITHSTANDING A STATE ADMINISTRATIVE ORDER.**

FPL's argument that Congress "did not allow" plaintiffs to proceed with citizen suits when state regulators have engaged in administrative action, such as the FDEP Consent Order, directly contradicts the plain language of, and Congressional intent behind, the CWA, as well as applicable Eleventh Circuit precedent interpreting the CWA. [Doc. 37, at 2] Congress' explicit allowance of cases such as this to proceed casts substantial doubt on whether the same issues resolved by Congress should be resurrected into a judicial bar under the guise of a standing challenge.

In regards to state administrative enforcement action such as that relied on by FPL, the CWA provides two potential bars on citizen suits: (1) when the state has commenced and is diligently prosecuting an action under comparable state law concerning the violations alleged in a citizen suit, 33 U.S.C. § 1319(g)(6)(A)(ii); and (2) where the State has addressed the CWA violations alleged in the citizen suit through the issuance of a final order not subject to further judicial review and the violator has paid a penalty. 33 U.S.C. § 1319(g)(6)(A)(iii).[2] However, 33 U.S.C. § 1319(g)(6)(B) expressly limits the applicability of these administrative enforcement bars and, as is the case here, provides that these bars shall not apply to any violation of the CWA for which:

> notice … has been given … prior to commencement of an action under this subsection and an action under section 1365(a)(1) of this title with respect to such alleged violation is filed before the 120th day after the date on which such notice is given.

---

[2] This administrative enforcement bar would not be raised by the Consent Order in any event, because there was no civil penalty assessed against FPL.

10

33 U.S.C. § 1319(g)(6)(B)(ii).

In interpreting § 1319(g)(6)(B)(ii), the Eleventh Circuit has recognized that the goal of the CWA is to restore the chemical, physical, and biological integrity of the nation's waters, and that Congress intended for this goal to be accomplished by enlisting the assistance of both governments and private citizens. *Black Warrior Riverkeeper, Inc. v. Cherokee Mining, LLC*, 548 F. 3d 986, 990 (11th Cir. 2008) ("*Cherokee Mining*"). *Cherokee Mining* held that citizen suits are "a proven enforcement tool," operating as Congress intended, "to *both spur and supplement* … government enforcement actions." *Id*. at 992, *quoting* S. Rep. No. 99-50, 28 (1985) (emphasis added).  Thus, 33 U.S.C. § 1319(g)(6)(B)(ii) balances the right of private citizens to bring citizen suits against polluters with the avoidance of duplicate prosecution against polluters to accomplish Congress' goals.  Additionally, since the statutory right to bring a citizen suit is established by Congress, it is "entirely appropriate" for Congress to determine "who may enforce [those rights] and in what manner." *Id*.  Accordingly, the limitations on citizen suits set out in § 1319(g)(6)(A) are lifted so long as the notice and filing requirements of § 1319(g)(6)(B)(ii) are met.  *Id*.

Pursuant to 33 U.S.C. § 1319(g)(6)(B)(ii), Plaintiffs gave notice of FPL's violations of the CWA over a month prior to the FDEP Notice of Violation concerning the groundwater contamination to the west of the cooling canal system and the "Warning Letter" regarding discharges to Biscayne Bay.   Plaintiffs then filed their original Complaint within 120 days of this notice, obviating the application of the administrative enforcement bars.  [Doc. 32, ¶ 7].  Though Plaintiffs are cognizant that standing is a constitutional doctrine distinct from statutory preemption under the CWA, the Congressional balancing of the right to bring citizen suits against avoidance

11

of duplicate prosecution, as reflected in the CWA itself, puts to rest any argument over what Congress did or did not allow.[3]

Consistent with Congress's determination of when citizens may enforce the CWA, district courts in this circuit have applied 33 U.S.C. § 1319(g)(6)(B)(ii) to reject similar motions to dismiss made by other violators.  In *Black Warrior Riverkeeper, Inc. v. Birmingham Airport Authority*, 561 F. Supp. 2d 1250, 1253, (N.D. Ala. 2008), the state regulatory agency commenced an administrative proceeding that resulted in a consent order after the plaintiff had served its 60-day notice of intent to sue.  The court rejected the defendant's assertion that it should refrain from exercising jurisdiction in deference to the state agency, holding instead that the citizen suit fell squarely within the exception set forth in 33 U.S.C. § 1319(g)(6)(B)(ii).  *Id*.; *accord*, *Altamaha Riverkeepers v. City of Cochran*, 162 F. Supp. 2d 1368, 1373 (M.D. Ga. 2001) ("*Altamaha Riverkeepers*") (even if state regulator takes action after receiving notice but before the citizen's suit is filed, the suit may proceed if it is filed within 120 days of the notice).

Moreover, because the statutory language of the CWA plainly allows for citizen suits to proceed, notwithstanding the commencement of an enforcement action between the date of the 60-day notice and the date that the lawsuit is filed, the court in *Black Warrior v. Birmingham Airport Authority* also rejected an argument that the court should defer to the state under the doctrine of primary jurisdiction.  561 F. Supp. 2d at 1255.  Similarly, applying 33 U.S.C. § 1319(g)(6)(B)(ii) and traditional principles of standing, *Altamaha Riverkeepers* held that the plaintiff had standing to prosecute their CWA citizen suit even though the state regulator had proposed a consent order

---

[3]  Despite its assertions regarding Congressional intent and the role of citizen's suits, FPL addressed 33 U.S.C. §1319(g)(6)(B) only in a footnote.  [Doc. 37 at 2, 19, n. 10] (noting that the *Cherokee Mining* case eventually was dismissed on mootness grounds after the defendant had come into compliance with its permit, a crucial fact that FPL does not and could not claim has occurred in this case).

and had fined the polluter.  162 F. Supp. 2d at 1372-73.  The same conclusion should apply in this case.

## II.     THE PLAINTIFFS HAVE STANDING UNDER THE FACTS OF THIS CASE AND WELL-ESTABLISHED LAW.

### A.     Plaintiffs Have Alleged CWA Violations Distinct From and In Addition to the Matters Addressed in the Consent Order, These Violations Are Ongoing, and FPL Is Not In Compliance With Its Permit or the CWA.

The gravamen of FPL's motion is its repeated assertions that the Consent Order addresses all violations and issues raised in the Amended Complaint and fully resolves all of the Plaintiffs' claims, thereby defeating the standing element of redressability.[4]  [Doc. 37, at 2, 13, 15].  These assertions are false.[5]

The Consent Order and the Amended Complaint both concern the pollution flowing from FPL's cooling canal system, but the Consent Order far short of fully addressing all of the violations alleged in the Amended Complaint:

First, the Consent Order does not allege or address CWA violations by FPL arising out of the discharge of polluted waters from the cooling canal system into Biscayne Bay, nor did the Consent Order purport to prohibit all discharges into Biscayne Bay, whereas the Amended Complaint alleged these violations and sought this remedy.  [Doc. 32, ¶¶ 51, 59, 71].

Second, the Consent Order's remedies for the "issue" of pollution flowing into Biscayne Bay addressed only two sources -- the Turtle Point Canal and Barge Basin Areas -- rather than the

---

[4]  FPL does not challenge the other elements of Plaintiffs' standing in their Motion, injury in fact and causation. Plaintiffs have alleged facts in their Amended Complaint to support these elements and will prove their standing at trial.

[5]  The FDEP 2014 Administrative Order and the Consent Agreement between FPL and DERM are irrelevant to Plaintiffs' standing because they do not involve violations of the CWA or FPL's NPDES Permit.

multiple sources alleged in the Amended Complaint and described in the Martin Declaration. *Id.*, ¶¶ 52-55; Exhibit 3.

Third, the Consent Order did not address the new upwelling's of polluted groundwater that are alleged in the Amended Complaint and have been discovered since the execution of the Consent Order. *Id.,* ¶ 55.

Fourth, the Consent Order did not address all of the violations alleged in the Amended Complaint based on the flow of polluted water into the Biscayne Aquifer. *Id.*, ¶¶ 59-66.

Fifth, the Consent Order did not assess civil penalties, as are sought by the Amended Complaint. *Id.*, ¶¶ 68-69, 73-74, 79-80.

Moreover, the Consent Order falls far short of fully resolving Plaintiffs' claims or of compelling FPL's compliance with the CWA or its NPDES permit, now or in the future. Concerning the discharges of polluted water into Biscayne Bay, the Consent Order address only two of the multiple likely sources of discharge and in no way assures that discharges into this surface water will terminate. Plaintiffs have provided evidence to this Court that the only way to stop these discharges into Biscayne Bay is to eliminate the cooling canal system. *Id.*, ¶¶ 67, 72. After a trial, the Court may or may not impose this remedy, but the Court certainly cannot predetermine that decision based on the Consent Order.[6]

Similarly, concerning the discharges of polluted water into the Biscayne Aquifer, and resulting violations of water quality standards, the Consent Order falls short of comprehensively

---

[6] FPL's argument that the Plaintiffs are seeking to modify the permit misconstrues the permit's terms.  [Doc. 37, at 17].  As FPL recognizes, the permit does not authorize discharge to surface waters of the state.  *Id.*, at 10.  While the permit does authorize discharge to groundwater, it does so only to the extent that groundwater does not reach surface waters such as Biscayne Bay. Plaintiffs will present evidence that, because of the multiple connections between the groundwater in the Biscayne Aquifer and the Biscayne Bay, the only way to avoid discharge into Biscayne Bay is to eliminate the cooling canal system.

14

resolving these claims through compelled compliance with FPL's permit.  Due to the defects in FPL's groundwater model, the uncertainties surrounding the effectiveness of the measures contained in the Consent Order, and the multiple years required to ascertain the effectiveness of these measures, FPL's contention that the Consent Order represents a comprehensive resolution of these violations lacks credibility, and is, at best, premature.

**B.     The Plaintiffs Have Standing Under Governing Precedent.**

Ultimately, FPL has not asserted, nor could it, that the Consent Order has brought it into compliance with its permit and with the CWA.  Absent such a demonstration, proved through evidence of compliance over a period of time, Plaintiffs' claims are redressible under longstanding precedent from the Supreme Court and the Eleventh Circuit.  These cases establish a three-part test for standing:  (1) an injury-in-fact, (2) a causal connection between the injury and the defendant's actions, and (3) a likelihood that the requested relief will redress the alleged injury. *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F. 3d 1271, 1279 (11th Cir. 2015), *citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Parker v. Scrap Metal Processors, Inc.*, 386 F. 3d 993, 1003 (11th Cir. 2004).

In this case, Plaintiffs have alleged an injury-in-fact that is causally connected to FPL's actions, and FPL has not contended otherwise.  Each of the Plaintiffs have members who live, work, and recreate on Biscayne Bay near the Turkey Point Power Plant and who have environmental, recreational, property, economic, health, and aesthetic interests in these waters that have been, and continue to be, damaged by FPL's unlawful discharges of pollution into these waters.  [Doc. 32, ¶¶ 13, 15, 17-18].  Likewise, each Plaintiff has members who use drinking water supplied from the Biscayne Aquifer near the FPL Turkey Point Power Plant, who have property, economic, and health interests in these waters that are damaged by the Defendant's pollution.  *Id.*

Plaintiffs' injuries are also likely to be redressed by the requested relief. Plaintiffs seek civil penalties as well as an enforcement order/injunction requiring that FPL take immediate and substantial action(s) to stop the discharge of industrial wastewaters containing pollutants into Biscayne Bay and the Biscayne Aquifer, and take permanent steps to prevent additional pollutants from being discharged from the FPL Power Plant in violation of its NPDES permit. *Id*., ¶ 19; *see also* ¶¶ 67-68, 72-73, 78-79. Plaintiffs have alleged and have offered proof that the only means of stopping FPL's unlawful discharges into Biscayne Bay and otherwise bring FPL into compliance with the CWA, its NPDES permit, and Florida water quality standards is to eliminate the discharge of polluted waters into the cooling canal system through construction of a closed cooling water system, such as closed-system mechanical cooling towers. *Id*., ¶¶ 67, 72; *see also* Exhibit 4 (Declaration and Report of Powers Engineering).

Because the Plaintiffs seek relief that will redress their injuries, Plaintiffs have standing. *Black Warrior v. U.S. Army Corps of Engineers*, 781 F. 3d at 1280-81; *Parker*, 386 F. 3d at 1003; *Altamaha Riverkeepers*, 162 F. Supp. 2d at 1372. As the court held in *Altamaha Riverkeepers*, the Consent Order, which may or not reduce FPL's pollution over the next 3 to 10 years, but which certainly has not resulted in compliance at present, does not eliminate the element of redressability. *Id*. This is particularly true where, as outlined above, Plaintiffs have alleged many violations beyond the matters addressed in the Consent Order and those violations are ongoing.

In addition to distorting of the facts, the central legal error of FPL's argument is that it seeks to convert issues of fact and ultimate proof – whether the Court should grant an enforcement order and civil penalties and, if so, the details of those forms of relief – into an issue of law as to whether the Court has jurisdiction. Further, FPL seeks to have the Court pre-judge those factual issues. To the contrary, whether the Court ultimately will grant relief, and the form of that relief,

16

can be determined only after discovery and a full presentation of the evidence for the Court's consideration.

In the absence of any CWA standing cases that supported its argument, FPL instead relied on inapposite cases from other circuits that applied the related but distinct doctrine of mootness. However, applying Eleventh Circuit precedent, even principles of mootness reinforce Plaintiffs' standing.[7]

The critical test for mootness is whether there is "no reasonable expectation that the wrong will be repeated." *Gwaltney of Smithfield v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 66 (1987); *Atlantic States Legal Foundation, Inc. v. Tyson Foods Inc.*, 897 F. 2d 1128, 1134-35 (11th Cir. 1990). In *Atlantic States*, the Eleventh Circuit applied this test to hold that the plaintiff's claim for injunctive relief was moot because the defendant had come into compliance with its permit, and had stayed in compliance for two years. 897 F. 2d at 1135. Conversely, the plaintiff's claim for civil penalties was not moot so long as violations were ongoing at the time the complaint was filed. *Id*. at 1134-35. The court bolstered its holding by noting that citizen suits are an important supplement to government enforcement of the CWA, and that civil penalties serve as an important deterrent against future violations. *Id*. at 1136.

Consideration of the *Atlantic States* test buttresses that the Plaintiffs' claims are redressible. FPL does not claim that it has come into compliance with its permit, nor could it. Moreover, the Plaintiffs have alleged, and have offered evidence to support, that FPL's multiple violations of its permit and of the CWA are ongoing and will continue absent an appropriate enforcement

---

[7] A critical difference between standing and mootness is that the burden to demonstrate standing is on plaintiffs, whereas the burden to show mootness is on the defendant. *Atlantic States*, 897 F. 2d at 1134. FPL's reliance on mootness cases while arguing standing is a transparent attempt to shift the burden to the Plaintiffs.

order/injunction from this Court.   Amended Complaint, ¶¶ 49, 51- 53, 60, 64, 66, 71, 76. Accordingly, the Plaintiffs' claims are redressible because FPL is not in compliance with its permit and Plaintiffs have alleged ongoing violations not resolved by the Consent Order.  *Black Warrior v. Birmingham*, 561 F. Supp. 2d at 1255.

Indeed, according to the Consent Order, itself, the actions FPL is undertaking may take 3 to 10 years to be effective, and there is no assurance that FPL's violations will cease at some future date, even if the Consent Order is implemented and functions as intended.  [Doc. 38-1, ¶¶ 19, 20a, 20c]; s*ee generally*, *Black Warrior Riverkeeper, Inc., v. Shannon, LLC,* No. 2:13-CV-00763-RDP, 2014 WL 1246473, at *5 (N.D. Ala. March 24, 2014) (finding of mootness requires evidence of a period of compliance).  This is especially true in light of the defects in FPL's groundwater model and the failure of the Consent Order address all of the pathways by which groundwater is flowing into Biscayne Bay.  *See* Exhibit 3, ¶¶ 10-12.

Rather than citing CWA standing cases, or even *Atlantic States,* FPL relied on inapposite cases from the Fifth and Sixth Circuits.  In *Environmental Conservation Organization v. City of Dallas*, 529 F. 3d 519, 5234-24 (5th Cir. 2008), the Fifth Circuit upheld summary judgment granted after the EPA had filed a CWA enforcement action in court similar to the plaintiffs' citizen suit, and the same court hearing the plaintiff's CWA claims had approved a Consent Decree that was designed to ensure compliance with polluter's permit, including $800,000 in civil penalties. Because there was no realistic prospect that the violations alleged in the complaint would continue after the court-approved Consent Decree, the case was moot.  *Id*. at 529.  In contrast, in this case,

18

there is no court-approved consent decree and, as demonstrated above, the violations alleged in the Amended Complaint are continuing.[8]

FPL also relied on *Ellis v. Gallatin Steel Co*., 390 F.3d 461 (6th Cir. 2004), a case that involved neither standing, nor mootness, but the appropriateness of the entry of injunctive relief in a citizen's suit after the EPA had filed an enforcement action and the court had approved a Consent Decree that included remedial measures and extensive civil penalties. 390 F. 3d at 468, 475-76.   Under these circumstances, the Court of Appeals held that plaintiffs failed to show irreparable injury as required for injunctive relief, and also failed to show that the Consent Decree was not "diligent prosecution" under the Clean Air Act.   *Id*., at 475-76.   Thus, the facts and holdings of *Ellis* are far removed from the present case.[9]

Under the Eleventh Circuit cases cited above, Plaintiffs have standing for injunctive relief and civil penalties because the violations are continuing, because the Consent Order had not brought FPL into compliance with its permit and with the CWA, because it is at best uncertain that the Consent Order will bring FPL into compliance over the course of 10 years, and because Plaintiffs allege violations that are distinct from and in addition to the violations addressed by the Consent Order.   Even if FPL eventually achieved compliance many years from now, Plaintiffs will continue to have standing on their claims for civil penalties because FPL's violations were ongoing at the time the complaint was filed.   *Atlantic States*, 897 F. 2d at 1134-35.   Accordingly, the Court should deny FPL's motion.

---

[8] For similar reasons, the eventual dismal of the Black Warrior case on mootness grounds has no relevance to FPL's motion because the Black Warrior defendant had come into compliance and stayed in compliance for a period of time.  Black Warrior Riverkeeper, Inc., v. Cherokee Mining, LLC, 637 F. Supp. 2d 983, 986, 989 (N.D. Al. 2009).

[9] The Clean Air Act case of *Little v. Louisville Gas & Elec. Co*., 33 F. Supp. 3d 791 (W.D. Ky. 2014), which relied on *Ellis* and was cited by FPL in a footnote, is inconsistent with Eleventh Circuit precedent and should be disregarded.

**CONCLUSION**

For many years, polluted cooling water has discharged from FPL's cooling canal system into Biscayne Bay and into the Biscayne Aquifer, resulting in multiple violations of FPL's permit, yet only in June 2016, long after the Plaintiffs' 60-day notice of intent to sue, has FDEP sought any measures to attempt that address these discharges into Biscayne Bay or the contamination of the Biscayne Aquifer under FPL's NPDES Permit.   Under these circumstances, the explicit language and intent of the CWA is for the Plaintiffs' case to proceed.   33 U.S.C. § 1319(g)(6)(B)(ii), *Black Warrior*, 548 F. 3d at 992.  Further, Plaintiffs have demonstrated that their injuries are redressible because the Consent Order did not address all of the violations alleged in the Amended Complaint and did not ensure that no further violations will occur, nor did it impose civil penalties, and these violations are ongoing.  FPL's motion to dismiss should be denied.

Respectfully submitted this 14th day of November, 2016.

*/s/ James M. Porter*
James M. Porter (Fla. Bar No. 443329)
JAMES M. PORTER, PA
9350 South Dixie Highway
10th Floor
Miami, Florida 33156
Tel: (305) 671-1345
Jim@JamesMPorterPA.com

Gary A. Davis (N.C. Bar No. 25976)
(*Pro Hac Vice* )
James S. Whitlock (N.C. Bar No. 34304)
(*Pro Hac Vice*)
DAVIS & WHITLOCK, P.C.
21 Battery Park Avenue
Suite 206
Asheville, NC 28801
(828) 622-0044
(828) 398-0435
gadavis@enviroattorney.com
jwhitlock@enviroattorney.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 14, 2016, a true and correct copy of the foregoing and Plaintiffs Exhibits 1-4 was served by transmission of Notice of Electronic Filing generated by CM/ECF on all counsel or parties of record listed below:

Jamie Zysk Isani (Florida Bar No. 728861)
jisani@hunton.com
Barry R. Davidson (Florida Bar No. 107678)
bdavidson@hunton.com
Jordi C. Martínez-Cid (Florida Bar No. 100566)
jmartinez-cid@hunton.com
HUNTON & WILLIAMS LLP
1111 Brickell Avenue, Suite 2500
Miami, Florida 33131
Telephone: (305) 810-2500
Facsimile: (305) 810-1675

Nash Long
nlong@hunton.com
Brent Rosser
brosser@hunton.com
Emma C. Merritt
emerritt@hunton.com
HUNTON & WILLIAMS LLP
Bank of America Plaza, Suite 3500
101 South Tryon Street
Telephone: (704) 378-4700
Facsimile: (704) 378-4890

Michael W. Marcil (Fla. Bar No. 91723)
mmarcil@gunster.com
GUNSTER YOAKLEY & STEWART PA
450 E Las Olas Blvd Ste 1400
Fort Lauderdale, FL 33301-4206
Telephone: (954) 468-1385
Facsimile: (954) 523-1722

Charles L. Schlumberger (Fla. Bar 109255)
Charles.Schlumberger@fpl.com
Senior Litigation Counsel
FLORIDA POWER & LIGHT COMPANY
700 Universe Boulevard
Juno Beach, FL 33408
Telephone: (561) 304-6742
Facsimile: (561) 691-7103

21

s/ James M. Porter