UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 16-23017-CIV-GAYLES/OTAZO-REYES

SOUTHERN ALLIANCE FOR CLEAN ENERGY,
TROPICAL AUDOBON SOCIETY INCORPORATED,
and FRIENDS OF THE EVERGLADES, INC.,

    Plaintiffs,

v.

FLORIDA POWER & LIGHT COMPANY,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

THIS CAUSE came before the Court upon Defendant Florida Power & Light Company's ("Defendant" or "FPL") Motion to Dismiss Amended Complaint, based on Federal Rule of Civil Procedure 12(b)(1) (hereafter, "Motion to Dismiss") [D.E. 37]. This matter was referred to the undersigned by the Honorable Darrin P. Gayles, United States District Judge, pursuant to Title 28, United States Code, Section 636 [D.E. 54]. The undersigned held a hearing on this matter on August 3, 2017 [D.E. 57]. Having heard the argument of counsel and having considered the record and the applicable law, the undersigned respectfully recommends that the Motion to Dismiss be DENIED.

## PROCEDURAL AND FACTUAL BACKGROUND

In this citizen suit, Plaintiffs Southern Alliance for Clean Energy ("SACE"), Tropical Audobon Society Incorporated ("TAS"), and Friends of the Everglades, Inc. ("Friends") (collectively, "Plaintiffs") assert claims against FPL for alleged violations of the federal Clean Water Act ("CWA"). See Am. Compl. [D.E. 32]. The alleged violations arise "from the

discharge of industrial wastewater containing pollutants from FPL's Turkey Point Power Plant near Homestead, Florida, into the protected waters of Biscayne Bay and to ground water, including the Biscayne Aquifer, in violation of the terms of National Pollutant Discharge Elimination System ("NPDES") Permit No. FL0001562 ("NPDES Permit") and the CWA." Id. at 1. The pollutants allegedly being discharged are "excess salinity, phosphorus, ammonia, TKN (Total Kjeldahl Nitrogen - a measurement of nitrogen levels), total nitrogen, and radioactive tritium" into Biscayne Bay; and "hypersaline water contaminated with radioactive tritium and other pollutants into ground water." Id. at 2.

Section 505(a) of the CWA, 33 U.S.C. § 1365(a) (hereafter, "Section 1365") supplies federal question jurisdiction over citizen suits such as this one. Plaintiffs have alleged compliance with Section 1365's pre-suit notice and timing requirements, id. at 2-3, and FPL does not challenge such compliance. Instead, FPL predicates its Motion to Dismiss for lack of subject matter jurisdiction on Article III standing grounds, arguing that Plaintiffs' claims are not redressable because they are being addressed in administrative proceedings at the state and local levels. Plaintiffs counter that FPL's jurisdictional arguments actually sound in the related doctrine of mootness rather than redressability, and further argue that the state and local administrative actions do not address the same violations as their citizen suit and do not seek the same relief. Id. at 3. However, FPL asks the Court to go behind the pleadings by mounting a factual attack on the Court's subject matter jurisdiction. See Motion to Dismiss [D.E. 37 at 14] ("This motion is a 'factual attack.'").

## APPLICABLE LAW

### I. Motion to Dismiss Standard

Attacks on subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) come in two forms. "Facial attacks" on the complaint require the court merely to look and see

2

> if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion. "Factual attacks," on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered.

Lawrence v. Dunbar, 919 F.2d 1525, 1528-29 (11th Cir. 1990) (citations omitted). When the attack is factual

> the trial court may proceed as it never could under [Fed.R.Civ.P.] 12(b)(6) or Fed.R.Civ.P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

Id. at 1529 (citations omitted).

However, "when the defendant's attack also implicates an element of the cause of action [t]he proper course of action for the district court is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case." Id. Moreover, "when the jurisdictional basis of a claim is intertwined with the merits, the district court should apply a Rule 56 summary judgment standard when ruling on a motion to dismiss which asserts a factual attack on subject matter jurisdiction." Id. at 1530. Thus, "federal claims should not be dismissed on motion for lack of subject matter jurisdiction when that determination is intermeshed with the merits of the claim and when there is a dispute as to a material fact." Id. at 1531.

**II. Standing**

"Standing is a jurisdictional inquiry, and a party invoking federal jurisdiction bears the burden of establishing that he has standing to sue." Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 781 F.3d 1271, 1279 (11th Cir. 2015) (citations omitted). "[P]laintiffs must satisfy three requirements to have standing under Article III of the Constitution: (1) injury-

3

in-fact; (2) a causal connection between the asserted injury-in-fact and the challenged action of the defendant; and (3) that the injury will be redressed by a favorable decision." Id. Here, FPL only challenges the redressability prong of the standing inquiry.

### III. Mootness

The case or controversy requirement of Article III and "[l]ongstanding principles of mootness . . . prevent the maintenance of suit when there is no reasonable expectation that the wrong will be repeated." Atlantic States Legal Found., Inc. v. Tyson Foods, Inc., 897 F.2d 1128, 1133-34 (11th Cir. 1990). "In seeking to have a case dismissed as moot, however, the defendant's burden is a heavy one." Id. at 1134.

In Atlantic States, the Eleventh Circuit addressed the issue of mootness in the context of a citizen suit alleging violations of the CWA and an NPDES permit as follows:

> Specifically, we find that for purposes of assessing a plaintiff's allegations of ongoing violations, the court must always look to the date the complaint was filed. If on and after that date, the defendants continued to violate their NPDES permit, then the plaintiffs may request both injunctive relief and civil penalties. . . . If, after the complaint is filed, the defendant comes into compliance with the [CWA], then traditional principles of mootness will prevent maintenance of the suit for *injunctive relief* as long as there is no reasonable likelihood that the wrongful behavior will recur. However, the mooting of injunctive relief will not moot the request for civil penalties as long as such penalties were rightfully sought at the time the suit was filed.
>
> Id. at 1134-35 (emphasis in original).

### IV. Statutory framework

#### A. *Prohibition against pollution.*

The CWA provides, in pertinent part:

> Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful.

33 U.S.C. § 1311(a).

4

### B. *Permits.*

Subject to certain exceptions, the Administrator of the Environmental Protection Agency ("EPA") (hereafter, "Administrator")

> may, after opportunity for public hearing issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title, upon condition that such discharge will meet either (A) all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title, or (B) prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter.

33 U.S.C. § 1342(a)(1). The title of 33 U.S.C. § 1342 (hereafter, "Section 1342"), "National pollutant discharge elimination system," provides the name for such permits, namely, "NPDES."

Section 1342 further provides that the Administrator may delegate the authority to issue and enforce NPDES permits to states that comply with the statutory requirements for such delegation. 33 U.S.C. § 1342(b). The Florida Department of Environmental Protection ("FLDEP") administers the NPDES permits in the State. See Fla. Stat. § 403.087.

### C. *Citizen suits.*

The CWA further provides, in pertinent part:

> Except as provided in subsection (b) of this section and section 1319(g)(6) of this title, any citizen[1] may commence a civil action on his own behalf—
>
> (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or
>
> (2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

---

[1] "Citizen" is defined as "a person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g).

> The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title.

33 U.S.C. § 1365(a) (hereafter, "Section 1365"). The Eleventh Circuit has ruled that there is federal subject matter jurisdiction over Section 1365 citizen suits that are brought pursuant to state-issued NPDES permits. Parker v. Scrap Metal Processors, Inc., 386 F.3d 993, 1008 (11th Cir. 2004).

## JURISDICTIONAL FACTS

1. FPL owns and operates the Turkey Point Power Plant, located on the shores of Biscayne Bay near Homestead, Florida, about 25 miles south of downtown Miami. The Plant includes two nuclear generation units.

2. In 1971, the late Honorable C. Clyde Atkins, United States District Judge, issued a Final Judgment requiring the construction of a closed loop cooling canal system (hereafter, "CCS") for feeding cooling water to the nuclear generator units. See United States v. Florida Power & Light Co., 53 F.R.D. 249 (S.D. Fla. 1971).

3. The CCS actually consists of an extensive network of canals. The water that is used to absorb excess heat from the nuclear generator units makes a 48-hour circuit through the CCS during which heat is dissipated, as the CCS acts like a giant radiator.

4. Below is an aerial view of the CCS [D.E. 38-1 at 28]:



5. Pursuant to the Final Consent Judgment, FLDEP issued NPDES # FL0001562 (hereafter, "NPDES Permit" or "Permit") to FPL for the construction of the CCS. The current version of the permit became effective on May 6, 2005 and expired on May 5, 2010, but has been administratively extended during the pending renewal process.

6. The NPDES Permit provides, in pertinent part:

WASTEWATER TREATMENT:

Wastewater from the Turkey Point facility consists of a non-contact once-through condenser cooling water (OTCW), auxiliary equipment cooling water (AECW), low-volume waste (LVW), and stormwater. LVW consists of chemical treatment system wastewater, boiler blowdown, reverse osmosis concentrate, condensate polishing system backwash water, and other process wastestreams. Stormwater includes stormwater associated with industrial activity and stormwater not associated with industrial activity.

OTCW and AECW discharge to the facility's approximately 6,700 acre onsite closed loop cooling canal system. LVW, equipment area stormwater, and non-equipment area stormwater/drainage discharge either directly to the onsite closed loop cooling canal system or indirectly to the same system via solids settling basins and/or neutralization basin. The cooling canal system is not lined, and therefore, discharges to Class G-III groundwater. The cooling canal system does not discharge to surface waters of the state.

7

See Permit [D.E. 38-3 at 5].[2]

    7.    The NPDES Permit includes the following pertinent conditions:

| | |
|---|---|
| Condition I.A.1: | This permit does not authorize discharge to surface waters of the state. |
| Condition I.E.14: | Notwithstanding any other requirements of this "No Discharge" permit, the permittee shall comply with all applicable provisions of the Final Judgement dated September 10, 1971, in Civil Action Number 70-328-CA issued by the U.S. District Judge C. Clyde Atkins of the Southern District of Florida. |
| Condition IV.1: | The Permitee's discharge to ground water shall not cause a violation of the minimum criteria for ground water specified in Rule 62-520.400, F.A.C. and 62-520.430, F.A.C.[3] |
| Condition VIII.5: | The permittee shall take all reasonable steps to minimize or prevent any discharge, reuse of reclaimed water, or residuals use or disposal in violation of this permit which has a reasonable likelihood of adversely affecting human health or the environment. It shall not be a defense for a permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this permit. [62-620.610(5), F.AC.] |
| Condition VIII.7: | The permittee shall at all times properly operate and maintain the facility and systems of treatment and control, and related appurtenances, that are installed and used by the permittee to |

---

[2] Class G-III ground water is classified by its use in the Florida Administrative Code as:
Non-potable water use, ground water in unconfined aquifers with a total dissolved solids content of 10,000 mg/L or greater; or with a total dissolved solids content of 3,000-10,000 mg/L and either has been reclassified by the Commission as having no reasonable potential as a future source of drinking water, or has been designated by the Department as an exempted aquifer pursuant to Rule 62-528.300(3), F.A.C.
Fla. Admin. Code 62-520.410.

[3] Rule 62-520.400 of the Florida Administrative Code provides, in pertinent part that:
(1) All ground water shall at all places and at all times be free from domestic, industrial, agricultural, or other man-induced non-thermal components of discharges in concentrations which, alone or in combination with other substances, or components of discharges (whether thermal or non-thermal):
\*\*\*
(f) Impair the reasonable and beneficial use of adjacent waters.
Fla. Admin. Code 62-520.400.
  Rule 62-520.430 of the Florida Administrative Code provides that "[t]he minimum criteria established in Rule 62-520.400, F.A.C., shall apply to all Class G-III ground water." Fla. Admin. Code 62-520.430(1).

> achieve compliance with the conditions of this permit. This provision includes the operation of backup or auxiliary facilities or similar systems when necessary to maintain or achieve compliance with the conditions of the permit. [62-620.610(7), F.A C.]

See Permit [D.E. 38-3 at 7, 11, 14-15].

8.  On April 25, 2016, FLDEP issued a Warning Letter [D.E. 38-8] and a Notice of Violation and Orders for Corrective Action (hereafter, "Notice of Violation") [D.E. 38-9] to FPL in connection with the operation of the CCS.

9.  On June 20, 2016, FLDEP and FPL entered into a Consent Order to address the issues identified in the Warning Letter and the Notice of Violation. See Consent Order [D.E. 38-1].

10. The Consent Order sets out the following objectives to be achieved by FPL: (1) "to cease discharges from the CCS that impair the reasonable and beneficial use of the adjacent G-II ground waters to the west of the CCS in violation of Condition IV.1 of the Permit and Rule 62-520.400, F.A.C.;" (2) "to prevent releases of groundwater from the CCS to surface waters connected to Biscayne Bay that result in exceedances of surface water quality standards in Biscayne Bay;" and (3) "to provide mitigation for impacts related to the historic operation of the CCS, including but not limited to the hypersaline plume and its influence on the saltwater interface." Id. at 8.[4]

11. The time frames for achieving the three objectives range from the submission of plans and reports in the near future to the implementation of remediation projects over several years. Id. at 8-14.

12. Separately, FPL entered into a Consent Agreement with Miami-Dade County's Department of Regulatory and Economic Resources, Division of Environmental Resources

---

[4] The term "hypersaline plume" means "water that exceeds 19,000 mg/L chlorides." Id. at 5. The term "saltwater interface" means "the intersection of class G-II and G-III groundwaters." Id.

Management ("DERM") on October 7, 2015 to address the issues raised in a Notice of Violation issued by DERM on October 2, 2015. See Consent Agreement [D.E. 38-2]. FPL and DERM entered into an Addendum to the Consent Agreement on August 15, 2016. See Addendum to Consent Agreement [D.E. 38-7].

13. The objectives of the Consent Agreement are "for FPL to demonstrate a statistically valid reduction in the salt mass and volumetric extent of hypersaline water (as represented by chloride concentrations above 19,000 mg/L) in groundwater west and north of FPL's property without creating adverse environmental impacts . . . [and] to reduce the rate of, and, as an ultimate goal, arrest migration of hypersaline groundwater." See Consent Agreement [D.E. 38-2 at 5].

14. The time frames for achieving these objectives range from the submission of plans and reports in the near future to the implementation of remediation projects over several years. Id. at 5-8.

15. The Addendum to the Consent Agreement addresses the appearance of ammonia in water samples in excess of allowable levels, and requires FPL to submit and implement a short term corrective action plan ("CAP"). See Addendum to Consent Agreement [D.E. 38-7 at 2-3].

16. Plaintiffs' Amended Complaint asserts the following claims:

Count 1: Violations of Effluent Limitations in the NPDES Permit, as set forth in Conditions I.A.1, I.E.14, IV.1, VIII.5, and VIII.7.

Count 2: Discharging Pollutants to Surface Waters Without an NPDES Permit.

Count 3: Discharges Causing or Contributing to Violations of Water Quality Standards.

See Am. Compl. [D.E. 32 at 14-23].

17. FPL contends that the violations of effluent limitations alleged in Count 1 (i.e.,

10

violations of Permit Conditions I.A.1, I.E.14, IV.1, VIII.5, and VIII.7) are addressed in the Consent Order and the Consent Agreement.  See Chart [D.E. 61-1 at 2].

18. FPL further contends that the allegation in Count 2 of discharging pollutants to Biscayne Bay without an NPDES permit is addressed in the Consent Order.  Id.

19. FPL further contends that the violations of water quality standards alleged in Count 3 are addressed in the Consent Order and the Consent Agreement.  Id.

20. Plaintiffs have submitted the Declaration of W. Kirk Martin, a Professional Geologist and Certified Groundwater Professional ("P.G. Martin") (hereafter, "Martin Decl.") [D.E. 40-3]; and the Supplemental Declaration of P.G. Martin (hereafter, "Martin Supp. Decl.") [D.E. 59-1].

21. After analyzing the groundwater model developed by FPL and relied upon by FLDEP in formulating the Consent Order and by DERM in formulating the Consent Agreement, P.G. Martin opines that the model suffers from a number of inadequacies.  See Martin Decl. [D.E. 40-3 at 6]; Martin Supp. Decl. [D.E. 59-1 at 5].

22. P.G. Martin further opines that, due to these inadequacies, the remediation actions required by the Consent Order and the Consent Agreement "will not stop the continued flow of contaminated water from the CCS to the surrounding groundwater system and the surface waters of Biscayne Bay."  See Martin Decl. [D.E. 40-3 at 7]; Martin Supp. Decl. [D.E. 59-1 at 6].

23. With respect to Addendum 1 to Consent Agreement, P.G. Martin reports an unresolved issue between DERM and FPL regarding the source of the excessive ammonia levels and the necessity for FPL to implement a CAP, and opines that any such CAP "will be delayed for the foreseeable future."  See Martin Supp. Decl. [D.E. 59-1 at 5].

24. Plaintiffs have also submitted the Declaration of Bill Powers, a Professional

Engineer ("P.E. Powers") (hereafter, "Powers Decl.") [D.E. 40-4].  According to P.E. Powers, the CCS is no longer adequately cooling the two nuclear generator units for which it was designed.  Id. at 3.  P.E. Powers recommends "the use of mechanical draft closed-cycle cooling towers, combined with the elimination of cooling tower wastewater discharges, as the best available technology for eliminating, rather than just mitigating, the water quality problems being caused by the CCS."  Id.

25.    In their Amended Complaint, Plaintiffs seek the following relief:  (1) a declaratory judgment that FPL has violated and is in violation of the NPDES Permit and the CWA; (2) an injunction requiring FPL to abate the discharge of pollutants in violation of the NPDES Permit and the CWA (including elimination of the CCS and construction of an alternative closed water cooling system, such as one composed of cooling towers); to remediate the migration of pollutants from the CCS into Biscayne Bay and ground waters; and to mitigate the damages caused by such migration; (3) an order requiring FPL to fully comply with the NPDES Permit; (4) civil penalties of up of $37,500 per day for each alleged violation of the CWA; and (5) attorneys' fees and costs.  See Am. Compl.  [D.E. 32 at 23-24].

## DISCUSSION

As noted above, FPL's Motion to Dismiss presents a factual attack on two related aspects of the standing requirement for the exercise of Article III subject matter jurisdiction: redressability and mootness.  Plaintiffs must establish redressability by showing that the alleged violations of the NPDES Permit and the CWA "will be redressed by a favorable decision." Black Warrior, 781 F.3d at 1279.  Mootness, which FPL bears the burden of establishing, requires a two-pronged analysis:  alleged violations existing on or after filing the Amended Complaint entitle Plaintiffs to seek both injunctive relief and civil penalties; violations that have

ceased in the course of the litigation preclude Plaintiffs from seeking injunctive relief but not civil penalties. Atlantic States, 897 F.2d at 1134-35. Moreover, to obtain a dismissal based on mootness, FPL must show that "there is no reasonable expectation" that violations alleged in the Amended Complaint "will be repeated." Id. at 1133-34.

### A.     *Redressability*.

As shown by the Jurisdictional Facts, the Consent Order and Consent Agreement set forth a number of objectives and time frames for achieving them that range from the submission of plans and reports in the near future to the implementation of remediation projects over several years. FPL acknowledges that compliance with the Consent Order and Consent Agreement "requires a number of steps, and takes a number of years." See Defendant's Rebuttal and Post-Hearing Brief [D.E. 61 at 5]. FPL argues, however, that to establish the requisite redressability, Plaintiffs "must demonstrate a realistic prospect that the alleged violations 'will not be cured even after the remedial plan imposed by the consent decree has been fully implemented in accordance with reasonable timetables.'" Id. (citing Envtl. Conservation Org. v. City of Dallas, 529 F.3d 519, 530 (5th Cir. 2008)). However, under binding Eleventh Circuit precedent, Plaintiffs can establish redressability by showing that the alleged violations of the NPDES Permit and the CWA "will be redressed by a favorable decision." Black Warrior, 781 F.3d at 1279. The relief sought in the Amended Complaint (in the form of a declaratory judgment, injunctive relief, full compliance with the NPDES Permit, and civil penalties) meets this standard. Therefore, the undersigned concludes that Plaintiffs have established the redressability element of standing and the Amended Complaint is not subject to dismissal on these grounds.

### B.     *Mootness.*

Application of the Atlantic States two-pronged mootness analysis requires a

determination of whether the violations alleged in the Amended Complaint are continuing or have ceased.  Atlantic States, 897 F.2d at 1134-35.  This analysis implicates the merits of Plaintiffs' claims and the resolution of factual disputes regarding the effectiveness of the Consent Order and the Consent Agreement raised by the declarations of Plaintiffs' experts P.G. Martin and P.E. Powers.  The Eleventh Circuit teaches that "federal claims should not be dismissed on motion for lack of subject matter jurisdiction when that determination is intermeshed with the merits of the claim and when there is a dispute as to a material fact."  Lawrence, 919 F.2d at 1531.[5]  Moreover, given the prospective, hence uncertain, nature of the remedial actions required by the Consent Order and Consent Agreement, FPL has not shown that "there is no reasonable expectation" that the violations alleged in the Amended Complaint "will be repeated."  Atlantic States, 897 F.2d at 1133-34.  Therefore, the Amended Complaint is not subject to dismissal for mootness.

## RECOMMENDATION

Based on the foregoing considerations, the undersigned RESPECTFULLY RECOMMENDS that Defendant's Motion to Dismiss be DENIED.

The parties have seven days from the date of this Report and Recommendation to file written objections, if any, with the Honorable Darrin P. Gayles.  Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained herein.  See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).  Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions."  See 11th Cir. R. 3-1 (I.O.P. - 3).

---

[5] The undersigned advisedly refrained from making any findings regarding the facts set forth in these declarations and limited the jurisdiction facts recitation to their contents.

RESPECTFULLY SUBMITTED in Miami, Florida this 20th day of September, 2017.

                                                   _____
                                                   ALICIA M. OTAZO-REYES
                                                   UNITED STATES MAGISTRATE JUDGE

cc:    United States District Judge Darrin P. Gayles
       Counsel of Record