**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

**Case No.: 1:16-cv-23017-DPG**

SOUTHERN ALLIANCE FOR CLEAN ENERGY,
TROPICAL AUDUBON SOCIETY INCORPORATED,
and FRIENDS OF THE EVERGLADES, INC.,

      Plaintiffs,

      v.

FLORIDA POWER & LIGHT COMPANY,

      Defendant.

_____/

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT FLORIDA POWER & LIGHT'S MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

1.    INTRODUCTION………………………………………………………….....…..1

2.    ARGUMENT…………………………………………………………………….1

I.    THE CLEAN WATER ACT REGULATES DISCHARGES OF POLLUTANTS
        TO NAVIGABLE WATERS THAT TRAVEL FROM A POINT SOURCE
        THROUGH HYDROLOGICALLY CONNECTED GROUNDWATER ………..1

A.  THE CLEAR WEIGHT OF AUTHORITY SUPPORTS CWA
        JURISDICTION OVER DISCHARGES OF POLLUTANTS TO
        NAVIGABLE WATERS THROUGH HYDROLOGICAL CONNECTED
        GROUNDWATER………………………………………………………………2

B.  THE ENTIRE CCS FACILITY IS A POINT SOURCE UNDER THE
        CLEAN WATER ACT DUE TO ITS REGULATION UNDER AN
        INVIDIDUAL NPDES PERMIT…………………………...……………....…5

II.   THE PLAIN AND UNAMBIGUOUS LANGUAGE OF FPL'S NPDES
        PERMIT PROHIBITS ANY DISCHARGE FROM THE CCS TO SURFACE
        WATERS…………………………………...………………………………..8

A.  THE COURT DOES NOT NEED TO, AND SHOULD NOT, CONSIDER
        ANY EXTRINSIC EVIDENCE TO DETERMINE THE MEANING OF
        FPL'S NPDES PERMIT……………………………………………..……8

B.  FPL CANNOT COLLATERALLY ATTACH THE TERMS OF ITS
        NPDES PERMIT IN A CITIZEN ENFORCEMENT PROCEEDING…..…..12

III.  FPL HAS FAILED TO COMPLY WITH PROVISIONS OF THE 1971
        CONSENT DECREE………………………………….……………………14

IV.   FPL IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS'
        CLAIM THAT IT IS DISCHARGING WITHOUT A PERMIT IN
        VIOLATION OF THE CLEAN WATER ACT…………………………..…15

V.    FPL IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO ITS
        VIOLATIONS OF STATE GROUNDWATER STANDARDS
        INCORPORATED INTO ITS NPDES PERMIT………………………………...17

A.  PLAINTIFFS HAVE STANDING TO SUE FOR FPL'S VIOLATIONS OF
        CONDITION IV.1 OF ITS NPDES PERMIT AND THE CLEAN WATER
        ACT……………………………………………………………..……17

B.  PLAINTIFFS CAN ENFORCE STATE GROUNDWATER QUALITY
        STANDARDS INCORPORATED INTO FPL'S NPDES PERMIT IN THIS

CLEAN WATER ACT CITIZEN SUIT……………………….………......…20

VI.    FPL'S DISCHARGES OF NUTRIENT LADEN INDUSTRIAL
WASTEWATER FROM THE CCS TO BISCAYNE BAY VIOLATES
FLORIDA'S NUTRIENT WATER QUALITY CRITERIA IN VIOLATION
OF ITS NPDES PERMIT AND THE CWA…………………………………...…22

    A. FPL'S DISCHARGES OF POLLUTED INDUSTRIAL WASTEWATER
FROM THE CCS TO BISCAYNE BAY VIOLATE NUMERIC AND
NARRATIVE NUTRIENT CRITERIA…………………………………..…23

       1.  Violations of Numeric Nutrient Criteria…………………………….…24

       2.  Violations of Narrative Nutrient Criteria………………………....…25

    B. FPL'S DISCHARGES OF CONTAMINATED INDUSTRIAL
WASTEWATER FROM THE CCS TO BISCAYNE BAR VIOLATE
FLORIDA'S "NO DEGRADATION" STANDARD………………………..27

VII.   FPL IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO ANY OF
PLAINTIFFS' PROPOSED REMEDIES……………………………………..29

VIII.  CONCLUSION………………………………………………………..…30

# <u>CITATIONS</u>

<u>Cases</u>

*Kentucky Waterways Alliance v. Kentucky Utilities Co.*, 2018 WL 4559315 (6th Cir. Sept. 24, 2018)………………………………………………………………………1-2, 4-7, 8-9

*Tennessee Clean Water Network v. TVA*, 2018 WL 4559103 (6th Cir. Sept. 24, 2018)…...1-2, 4-9

*Upstate Forever v. Kinder Morgan Energy Partners, L.P.,* 887 F.3d 637 (4th Cir. 2018)……...2-3

*Sierra Club v. Virginia Electric & Power Co.,* 903 F.3d 403 (4th Cir. 2018)……………..2, 7-8

*Hawaii Wildlife Fund v. County of Maui,* 881 F.3d 754 (9th Cir. 2018)…………………………..2

*Concerned Area Residents for Env't v. Southview Farm,* 34 F.3d 114 (2nd Cir. 1994)..................3

*Peconic Baykeeper, Inc. v. Suffolk County,* 600 F.3d 180 (2nd Cir. 2010)………………………...3

*Yadkin Riverkeeper v. Duke Energy Carolinas,* LLC, 141 F.Supp.3d 428 (M.D.N.C. 2015)…….3

*Mutual Life Ins. Co. v. Mobil Corp*., No. Civ. A. 96-CV1781, 1998 WL 160820 (N.D.N.Y. 1998)……………………………………………………………………………..3

*Tennessee Riverkeeper v. Hensley-Graves Holdings,* LLC, 2013 WL 1230422 (N.D. Ala. Aug. 8, 2013)…………………………………………………………………..…3

*Flint Riverkeeper Inc. v. Southern Mills, Inc*., 276 F.Supp.3d 1359 (M.D. Ga. 2015)…..…3, 6, 16

*Day, LLC v. Plantation Pipe Line Co.,* 315 F.Supp.3d 1219 (S.D. Al. 2018)……………..………3

*Rapanos v. U.S.,* 547 U.S. 715 (2006)………………………………………………..…4

*Ecological Rights Foundation v. Pacific Gas and Elec. Co.,* 713 F.3d 502 (9th Cir. 2013)….…5-6

*U.S. v. Earth Sciences, Inc.,* 599 F.2d 368 (10th Cir. 1979)……………………………….…5

*Nat'l Pork Producers Council v. E.P.A.,* 635 F.3d 738 (5th Cir. 2011)…………………………5-6

*Ohio Valley Environmental Coalition, Inc. v. Hernshaw Partners, LLC,* 984 F.Supp.2d 589 (S.D. W.Va. 2013)………………………………………………………...……..6

*American Canoe Ass'n, Inc. v. Dist. Of Columbia Water and Sewer Authority,* 306 F.Supp. 2d 30 (D. D.C. 2004)…………………………………………………….…..…....8

*Natural Resources Defense Council, Inc. v. County of Los Angeles,* 725 F.3d 1194 (9th Cir. 2013)…………………………………………………………….........8-9

*Northwest Envt'l Advocates v. City of Portland*, 56 F.3d 979 (9th Cir. 1995)……………………8

*Kennewick Irrigation District v. United States,* 880 F.2d 1018 (9th Cir. 1989)………….….….8

*Klamath Water Users Protective Ass'n v. Patterson,* 204 F.3d 1206 (9th Cir. 1999)……….…10

*Holzworth v. United States*, 2011 WL 13298554 (M.D. Fla., May 17, 2011)……………..….11

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs,* 956 F. Supp. 588 (D.S.C. 1997)…….......12-13

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs,* 149 F.3d 303 (4th Cir. 1988)…………......12

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs,* 528 U.S. 167 (2000)……………..12, 17-19

*General Motors Corp. v. E.P.A.,* 168 F.3d 1377 (D.C. Cir. 1999)……………………………....13

*Ohio Valley Envt'l Coalition, Inc. v. Fola Coal Co., LLC,* 2013 WL 6709957 (S.D. W.Va. Dec. 19, 2013)……………………………………………………………..…13

*U.S. v. Gulf States Steel,* 54 F.Supp.2d 1233 (N.D. Al. 1999)………………………………….….13

*Public Interest Research Group of New Jersey, Inc. v. Powell-Duffryn Terminals, Inc.,* 913 F.2d 64  (3rd Cir. 1990)………………………………………………………………14

*Connecticut Fund for the Environment v. Job Plating Co., Inc.,* 623 F. Supp. 207 (D. Conn 1985)………………………………………………………………..….14

*Washington Wilderness Coalition v. Hecla Mining Co.,* 870 F.Supp. 983 (E. D. Wash. 1994)...15

*Hudson River Fishermen's Ass'n v. Westchester County,* 686 F.Supp 1044 (S.D. N.Y. 1988)………………………………………………………….……………...15

*Coosa Riverkeeper, Inc., v. Oxford Water Works and Sewer Board,* 2017 WL 2619087 ( N.D. Al. June 16, 2017)………………………………………………….………….…16

*Piney Run Pres. Ass'n v. County Comm'rs of Carroll County,* 268 F.3d 255 (4th Cir. 2001)......................................................................................................16, 21

*Ecological Rights Foundation v. Pacific Lumber Co*., 230 F.3d 1141 (9th Cir. 2000)…...17-19, 21

*Friends of the Earth, Inc. v. Gaston Copper Corp.,* 204 F.3d 149 (4th Cir. 2000)………..…18-20

*Sierra Club v. Morton,* 405 U.S. 727 (1972)………………………………..…………….……..18

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992)……………………….…….…………..18

*Bennett v. Spear,* 520 U.S. 154 (1977)……………………………………………...…19

*National Resource Defense Council v. EPA,* 437 F.Supp.2d 1137 (C.D. Cal. 2006)………..…..19

*Puerto Rico Campers Ass'n v. Puerto Rico Aqueduct and Sewer Auth.,* 219 F.Supp.2d 201 (D. Puerto Rico 2002)……………………………………………………………………19

*Franchise Tax Bd. of California v. Alcan Aluminum Ltd.,* 493 U.S. 331 (1990)……………..…19

*American Canoe Ass'n v. District of Columbia Water and Sewer Authority,* 306 F.Supp.2d 30 (D.D.C. 2004)…………………………………………………………………………..20

*Northwest Envt'l Advocates v. City of Portland,* 56 F.3d 979 (9th Cir. 1995)…………….....21, 22

*Connecticut Fund For Env't v. Raymark Indus., Inc.,* 631 F.Supp. 1283 (D. Conn. 1986)……..21

*Sierra Club v. City and County of Honolulu,* 2008 WL 3850495 (D. Hawaii Aug. 18, 2008)….21

*Sierra Club v. Simkins Industries, Inc.,* 847 F.3d 1109 (4th Cir. 1988)…………………...…..21

*Pymatuning Water Shed Citizens for a Hygienic Env't v. Eaton,* 506 F. Supp. 902 (W.D. Pa. 1980)……………………………………………………………………………………21

*Parker v. Scrap Metal Processors, Inc.,* 386 F.3d 993 (11th Cir. 2004)…………………..…21, 25

*Culbertson v. Coats Am., Inc.,* 913 F. Supp. 1572 (N.D. Ga. 1995)………………………....21-22

*Chattahoochee Riverkeeper Fund, Inc.* v. *City of Atlanta,* 953 F.Supp. 1541 (N.D. Ga. 1996)……………………………………………………………………………...…22

*Natural Resources Defense Council v. Metropolitan Water Reclamation District of Greater Chicago,* 175 F.Supp.3d 1041 (N.D. Ill. 2016)…………………………………………22

*Ohio Valley Envt'l Coalition v. Elk Run Coal Co., Inc.,* 2014 WL 29562 (S.D. W.Va. Jan. 3, 2014)……………………………………………………………………………...22

*Black Warrior Riverkeeper v. Birmingham Airport Auth.,* 561 F.Supp.2d 1250 (N.D. Al. 2008)……………………………………………………………………………...29

*Ohio Valley Envt'l Coalition, Inc. v. Apogee Coal Co., LLC,* 531 F.Supp.2d 747 (S.D. W.Va 2008)……………………………………………………………………...…29-30

Statutes and Other Authoritiesf

33 U.S.C. § 1365…………………………………..………………………….....1, 4, 20-21, 29-30

33 U.S.C. § 1362…………………………………………………………………………..6, 9

Florida Administrative Code 62-520.400………………………….……………………….…..6

Florida Administrative Code 62-520.430 …………………………………………………...6

42 U.S.C. § 6902……………………………………………………………………….....7

Sullivan, Thomas F.P., and Christopher L. Bell, *Environmental Law Handbook* (21st ed. 2011).................................................................................................................................9

Fed. R. Evid. 701……………………………………………………………..………………….11

Fed. R. Civ. P. 26……………………………………………………………………….……...11

33 U.S.C. § 1369……………………………………………………………………………12

S. Rep. No. 414, 92d Cong., 1st Sess. 79-80 (1971)………………………….………….13

Florida Statute § 120.68……………………………………………………………..….13

40 C.F.R. § 122.41……………………………………………………………...…21, 25

Florida Statute § 403.088………………………………………………………..23-25

Florida Administrative Code 62-302.532………………………………...…..23-24

Florida Administrative Code 62-302.530………………………………...23, 25-27

Florida Administrative Code 62-302.700……………………………...…..27-28

Plaintiffs, by and through their undersigned counsel, respectfully submit this Response in Opposition to Defendant Florida Power & Light Company's ("FPL") Motion for Summary Judgment [Doc. 150].    FPL's attempt to characterize its discharges of industrial wastewater containing pollutants from the CCS as mere "groundwater seepage" not subject to the CWA fails, as the CCS is permitted point source under the CWA and its discharges from the CCS are subject to the effluent limitations contained in its NPDES Permit.    Similarly, FPL's "No Discharge" NPDES Permit, and Condition I.A.1 in particular, plainly and unambiguously prohibits any discharges from the CCS to surface waters, including Biscayne Bay, and FPL's attempts to have the Court rewrite this language based on extrinsic evidence that itself directly contradicts the plain language of the NPDES Permit should be rejected, especially given that FPL has failed to exhaust its administrative remedies.    Furthermore, Plaintiffs have clearly demonstrated standing to sue for FPL's violations of Condition IV.1 of its NPDES Permit, as its discharges of hypersaline water containing pollutants, including tritium, from the CCS have created a groundwater contamination plume that has migrated far west of the CCS and adversely impacted the property interests of Plaintiffs' members.    Moreover, Plaintiffs can enforce FPL's violations of Condition IV.1 through this federal citizen suit, as Florida's groundwater quality standards have been incorporated into its NPDES Permit and constitute an "effluent standard or limitation under this chapter" within the meaning of 33 U.S.C. § 1365.

## ARGUMENT

I.    **THE CLEAN WATER ACT REGULATES DISCHARGES OF POLLUTANTS TO NAVIGABLE WATERS THAT TRAVEL FROM A POINT SOURCE THROUGH HYDROLOGICALLY CONNECTED GROUNDWATER.**

FPL argues, based solely on the Sixth Circuit's recent divided decisions in *Kentucky Waterways Alliance v. Kentucky Utilities Co.*, 2018 WL 4559315 (6th Cir. Sept. 24, 2018), and *Tennessee Clean Water Network v. TVA*, 2018 WL 4559103 (6th Cir. Sept. 24, 2018), that FPL's permitted discharges of industrial wastewater containing pollutants from the CCS are so-called "groundwater seepage" not regulated by the CWA.    However, the *Kentucky Waterways Alliance* and *Tennessee Clean Water Network* decisions stand alone among the circuit courts and further conflict with longstanding and more persuasive precedent, including decisions of district courts within the Eleventh Circuit, which have consistently held that there is CWA jurisdiction where pollutants travel from a point source to navigable waters through hydrologically connected

groundwater. Furthermore, both of Sixth Circuit decisions involved alleged <u>unpermitted</u> discharges in violation of the CWA and are thus inapposite to this case, where it is undisputed that the CCS is regulated through an individual NPDES Permit and thus constitutes a "point source" under the CWA. The Court should deny FPL summary judgment based on its overwrought "groundwater seepage" argument and find that the CCS is a "point source" under the CWA.

A.   **THE CLEAR WEIGHT OF AUTHORITY SUPPORTS CWA JURISDICTION OVER DISCHARGES OF POLLUTANTS TO NAVIGABLE WATERS THROUGH HYDROLOGICAL CONNECTED GROUNDWATER.**

Plaintiffs have alleged and maintained throughout this litigation that the CCS is a point source, and further that, consistent with the clear weight of authority, there is CWA jurisdiction where pollutants travel from the CCS to surface waters, including Biscayne Bay, through a direct hydrological connection via ground water. *See, e.g.,* [Doc. 114, ¶¶ 25-26, 31]; [Doc. 149-1, ¶¶ 25-26, ¶ 45, ¶¶ 84-85]. In *Kentucky Waterways Alliance* and *Tennessee Clean Water Network,* the Sixth Circuit became the first circuit court to hold that the CWA did not prohibit the discharge of pollutants to navigable waters that travel through hydrologically connected groundwater. *Kentucky Waterways Alliance,* 2018 WL 4559315 at *7-8; *Tennessee Clean Water Network,* 2018 WL 4559103 at * 6.

As discussed in detail in Plaintiffs' Motion for Partial Summary Judgment, [Doc. 159, pp. 15-19],[1] which discussion is incorporated herein by reference, these divided decisions of the Sixth Circuit stand in stark contrast to prevailing circuit court precedent, which has consistently held, in line with Supreme Court precedent and the position of EPA, that discharges of pollutants to groundwater that reaches navigable waters through a hydrological connection are subject to the CWA. *See Upstate Forever v. Kinder Morgan Energy Partners, L.P.,* 887 F.3d 637, 651 (4th Cir. 2018) (CWA covered discharges into groundwater before reaching rivers and wetlands, so long as there was a <u>direct hydrological connection</u> between the groundwater and the navigable water); *Sierra Club v. Virginia Electric & Power Co.,* 903 F.3d 403, 409 (4th Cir. 2018) ("*VEPCO*") (applying *Upstate Forever* and holding addition of pollutant into navigable waters via groundwater violated § 1311(a) given a direct hydrological connection; *Hawaii Wildlife Fund v. County of*

---

[1] Page number citations to documents filed in this case will be to their ECF designated page numbers for the Court's ease of reference.

2

*Maui,* 881 F.3d 754, 765 (9th Cir. 2018) (discharge to groundwater that is "fairly traceable"[2] to navigable waters gives rise to CWA liability).  Similarly, the Second Circuit has long held, outside of the groundwater context, that such "indirect discharges" are regulated by the CWA so long as there was a direct connection between the intervening conduits. *See Concerned Area Residents for Env't v. Southview Farm,* 34 F.3d 114, 118-119 (2nd Cir. 1994) (CWA covered discharge of pollutants that traveled through <u>fields</u> prior to reaching navigable waters); *Peconic Baykeeper, Inc. v. Suffolk County,* 600 F.3d 180, 188-89 (2nd Cir. 2010) (CWA jurisdiction over pollutants that traveled through the <u>air</u> before reaching navigable waters).

Numerous district courts, including courts within the Eleventh Circuit, have also long held that there is CWA jurisdiction over discharges of pollutants which travel through hydrologically connected groundwater prior to reaching navigable waters. *See, e.g.*, *Yadkin Riverkeeper v. Duke Energy Carolinas,* LLC, 141 F.Supp.3d 428 (M.D.N.C. 2015) (agreeing "with the line of cases affirming CWA jurisdiction over the discharge of pollutants to navigable surface waters via hydrologically connected groundwater, which serves as a conduit between the point source and the navigable waters"); *Mutual Life Ins. Co. v. Mobil Corp*., No. Civ. A. 96-CV1781, 1998 WL 160820, at *3 (N.D.N.Y. 1998) (finding complaint alleging "a hydrological connection between the contaminated groundwater and navigable waters" sufficient to state a claim under the CWA); *Tennessee Riverkeeper v. Hensley-Graves Holdings*, LLC, 2013 WL 1230422 at *6 (N.D. Ala. Aug. 8, 2013) (holding that any pollutant which enters navigable waters, whether directly or through groundwater, is subject to CWA regulation); *Flint Riverkeeper Inc. v. Southern Mills, Inc*., 276 F.Supp.3d 1359, 1367 (M.D. Ga. 2015) (plaintiffs stated claim for violation of CWA by alleging defendant discharges pollutants into navigable waters via hydrologically connected groundwater); *Day, LLC v. Plantation Pipe Line Co.,* 315 F.Supp.3d 1219, 1238-1239 (S.D. Al. 2018) (noting "substantial support" for indirect discharge theory when pollutant discharged from point source reaches navigable waters by means of groundwater flow pushing the pollutant through "intervening conduits).

---

[2] The *Upstate Forever* court stated that there was no "functional difference" between the Ninth Circuit's "fairly traceable" concept and EPA's "direct hydrological connection" concept that it adopted, as both addressed "point source discharges <u>through groundwater</u>."  *Upstate Forever,* 887 F.3d at 651, n. 12 (emphasis in original).

All of the foregoing cases, as well as the additional authority cited in Plaintiffs' Motion for Partial Summary Judgment, were premised on an interpretation of the plain language of the CWA, as well as an interpretation that is consistent with the CWA's broad purposes.  As held by Justice Scalia in his plurality opinion in *Rapanos v. U.S.,* 547 U.S. 715 (2006), the plain language of the CWA, and the definition of "discharge of pollutant" in particular, does not prohibit the addition of any pollutant <u>directly</u> to navigable waters from a point source, but rather the <u>addition of</u> any pollutant to navigable waters. *Rapanos,* 547 U.S. at 743 (plurality opinion) (emphasis added). However, in *Kentucky Waterways Alliance* and *Tennessee Clean Water Network,* the Sixth Circuit inexplicably based its decisions on its finding that the word "into," as used in the CWA's definition of "effluent limitations," indicated "directness" and left "no room for intermediary mediums to carry the pollutants." *Kentucky Waterways Alliance* at *7; *Tennessee Clean Water Network,* at *6.  However, as noted by the dissent, which went as far as to state that the majority was "way off of the rails," the definition of "effluent limitations" is irrelevant to citizens suits, as the CWA's citizen suit provision, 33 U.S.C. § 1365, uses the term "effluent standard and limitation" and not "effluent limitation."  *Id.* at *14, *11.  The dissent explained:

> Until today, no Circuit had come out the other way.  The reason is simple: the CWA does not require a Plaintiff to show that a defendant discharged a pollutant from a point source <u>directly</u> into navigable waters; a plaintiff must simply show that the defendant 'add[ed] … any pollutant <u>to</u> navigable waters <u>from</u> any point source.

*Tennessee Clean Water Network,* 2018 WL 4559103 at *10 (Clay, dissenting); *Kentucky Waterways Alliance,* 2018 WL 4559315 at *12 (Clay, concurring in part and dissenting in part) (emphases in originals).

Thus, for reasons recognized by the dissent, it comes as little surprise that FPL would seize on these minority view decisions:

> [t]he majority's approach defeats the CWA's purpose by <u>opening a gaping regulatory loophole</u>: polluters can avoid CWA liability by discharging their pollutants into groundwater, even if that groundwater flows immediately into a nearby navigable water. <u>This exception has no textual or logical foundation</u>.

*Id.* at *13 (Clay, concurring in part and dissenting in part) (emphasis added); *see also Tennessee Clean Water Network v. TVA*, 2018 WL 4559103 at *9 (Clay, dissenting) (emphasis added). However, FPL, and more specifically the CCS, simply does not fit into this "gaping regulatory loophole," as it is a permitted point source under the CWA, and its discharges are regulated under

4

the CWA, as discussed *infra*.   Regardless, given the overwhelming weight of current authority*,* including the decisions of district courts within the Eleventh Circuit, FPL's sweeping assertion that it is entitled to summary judgment on all of Plaintiffs CWA claims, based solely on these two divided decisions of the Sixth Circuit, is wholly without merit and should be rejected outright by the Court.   At worst, depending on how Petitions for Rehearing in the Sixth Circuit are decided, there may be a circuit split on this issue, which the Supreme Court may or may not resolve.

### B.     THE ENTIRE CCS FACILITY IS A POINT SOURCE UNDER THE CLEAN WATER ACT DUE TO ITS REGULATION UNDER AN INDIVIDUAL NPDES PERMIT.

FPL further asserts, again based entirely on *Kentucky Waterways Alliance* and *Tennessee Clean Water Network,* that the CCS is not a "point source" under the CWA, and even goes so far as to argue that the CCS's permitted discharges of contaminated industrial wastewater to groundwater are nothing more than "nonpoint source" pollution not subject to CWA regulation. However, like its so-called "groundwater seepage" argument, FPL's point source argument fails, as the CCS is a point source under the CWA based on the undisputed fact that it is regulated under an individual NPDES Permit, whereas the *Kentucky Waterways Alliance* and *Tennessee Clean Water Network* cases involved allegations of underpermitted discharges in violation of the CWA.

Individual NPDES permits are required for discharges from any "point source" under the CWA, but not for discharges from nonpoint sources.  *Ecological Rights Foundation v. Pacific Gas and Elec. Co.,* 713 F.3d 502, 505 (9th Cir. 2013).  As stated by the Tenth Circuit in *U.S. v. Earth Sciences, Inc.,* 599 F.2d 368 (10th Cir. 1979):

> The [CWA] was designed to regulate to the fullest extent possible those sources emitting pollution …. The touchstone of the regulatory scheme is that those needing to use the waters for waste distribution must seek and obtain a permit to discharge that waste, with the quantity and quality of the discharge regulated.

*Id.* at 373 (emphasis added).  Similarly, as articulated by the Fifth Circuit:

> To be clear, the CWA prohibits the discharge of pollutants into navigable waters. 33 U.S.C. § 1311.  However, if a facility requests a permit, it can discharge within certain parameters called effluent limitations *and will be deemed a point source*. 33 U.S.C. §§ 1342, 1362(14).   Accordingly, the point source will be regulated pursuant to the NPDES permit ….

*Nat'l Pork Producers Council v. E.P.A.,* 635 F.3d 738, 743 (5th Cir. 2011) (emphasis added).  Thus, once a facility, like the CCS, obtains coverage under an individual NPDES Permit, it constitutes a point source under the CWA, and its discharges are regulated by and subject to the effluent

limitations[3] contained in the permit.  In contrast, a "nonpoint source" refers to pollution arising "from many dispersed activities over large areas" that is "not traceable to any single discrete source." *Flint Riverkeeper Inc.,* 276 F.Supp.3d at 1367 (M.D. Ga. 2015); *Ohio Valley Environmental Coalition, Inc. v. Hernshaw Partners, LLC,* 984 F.Supp.2d 589 (S.D. W.Va. 2013) ("the non-point source designation is limited to <u>uncollected runoff water which is difficult to ascribe to a single polluter</u>") (emphasis added) (internal citations and quotations omitted); *Ecological Rights Foundation,* 713 F.3d at 508 ("nonpoint source" pollution is not defined under the CWA, such pollution is "<u>very difficult to regulate through individual permits</u>," and that the most common example is "the residue left on roadways by automobiles") (emphasis added).

In this case, it is undisputed that FDEP has, "pursuant to the Clean Water Act," issued FPL an individual NPDES Permit, Permit No. FL0001562, for the operation of the CCS.  [Doc. 151, ¶ 13]; [Doc. 149-1, ¶ 43].   The regulation of the CCS under an individual NPDES Permit deems the CCS a "point source" under the CWA, and FPL's discharges of industrial wastewater containing pollutants from the CCS are subject to the effluent limitations in its NPDES Permit.[4] *See, e.g., Nat'l Pork Producers Council,* 635 F.3d at 743; *see also* [Doc. 148-24, 128:24-129:10] [FDEP representative testifying that FDEP issues NPDES permits for point sources].  Therefore, by definition, the CCS is not a "nonpoint" source unregulated by the CWA, and its discharges are not "nonpoint source pollution;" indeed, CCS discharges are traceable to a single source (the CCS) and are easily ascribed to a single polluter (FPL).[5]   As such, the facts of this case are plainly distinguishable from both *Kentucky Waterways Alliance* and *Tennessee Clean Water Network,* as the alleged illegal discharges at issue in those case were <u>unpermitted</u> discharges, *i.e.*, unauthorized discharges not covered by an NPDES Permit.  *Tennessee Clean Water Network,* at *1 (ponds had an NPDES permit to discharge pollutants into the river through Outfall 001, which was

---

[3] An effluent limitation is defined as, in pertinent part, "any restriction established by a State … on <u>quantities</u>, rates, and concentrations of … constituents which are discharged <u>from point sources</u> …."  33 U.S.C. § 1362 (12)(emphasis added).

[4] In particular, FPL's NPDES Permit contains the following expressly designated "**EFFLUENT LIMITATIONS.**"  Condition I.A.1 provides that "[T]his permit does not authorize discharge to surface waters of the state," and Condition IV.1 provides that the CCS's "discharge to ground water shall not cause a violation of the minimum criteria for ground water specified in Rule 62-520.400, F.A.C. and 62-520.430, F.A.C." [Doc. 149-14, pp. 7, 11].

[5] In fact, it is undisputed that tritium acts as a "tracer" of CCS water in that above background levels of tritium in groundwater or surface waters near Turkey Point indicates the presence of CCS industrial wastewater. [Doc. 149-1, ¶¶ 30-31]; [Doc. 151, ¶ 25].

"indisputably" regulated by the CWA, but the issue on appeal was whether other alleged discharges, for which there was no permit, were subject to the CWA); *Kentucky Waterways,* 2018 WL 4559315 at *3, n.4 (coal ash ponds had designated discharge points covered by NPDES permits, but those were not the subject of the litigation); *see also VEPCO*, 903 F.3d at 408 (alleging that seepage of arsenic from coal ash into nearby rivers violated § 1311(a)'s general prohibition against the unauthorized discharge of a pollutant from a point source into navigable waters).

Further distinguishing these recent Sixth Circuit decisions from the case at hand is the fact that the *Kentucky Waterways Alliance* and *Tennessee Clean Water Network* court found that groundwater was not a "point source" under the CWA. *Kentucky Waterways Alliance,* 2018 WL 4559315 at *5; *Tennessee Clean Water Network,* 2018 WL 4559103 at *6 (holding that groundwater is not a point source, but instead is a nonpoint source conveyance).[6]  As discussed *supra,* Plaintiffs have made no such allegation in this matter; rather, they have alleged and maintained from the filing of this case that the CCS is a point source, which the entire facility is, as evidenced by language of FPL's NPDES Permit, which provides, *inter alia:*

> The cooling canal system is not lined, and therefore, discharges to Class G-III groundwater. The cooling canal system does not discharge to surface waters of the state.

[Doc. 149-14, p. 5] [emphasis added].  Additionally, in both *Kentucky Waterways Alliance* and *Tennessee Clean Water Network,* the Sixth Circuit was clear that since coal ash and other coal combustion residuals are solid waste, they are regulated under the federal Resource Conservation and Recovery Act ("RCRA").  42 U.S.C. § 6902(a)(1).  Thus, given that RCRA and the CWA are mutually exclusive, the Sixth Circuit noted that had it found that the discharges at issue were covered by the CWA, it would have resulted in the "problematic" result of coal ash treatment and storage being "exempted from RCRA's coverage."  *See, e.g.*, *Kentucky Waterways Alliance,* 2018 WL 4559315 at *9.  This statutory conflict was made even "more problematic" by the fact that

---

[6] While FPL asserts that *Kentucky Waterways Alliance* and *Tennessee Clean Water Network* held that the coal ash ponds at issue in those cases were not "point sources," the Sixth Circuit never expressly so held.  Instead, the court in *Kentucky Waterways Alliance* stated that it "doubted" that the coal ash ponds were point sources, based on the Fourth Circuit's holding in *VEPCO*.  *Id.* at *7, n. 8.  In *Tennessee Clean Water Network,* the court expressly stated it was not deciding the case based on whether or not the coal ash ponds were point sources and simply noted the *VEPCO* decision in a footnote.  *Id.* at *5, n. 6.

EPA has issued a formal rule under RCRA, known as the "CCR Rule," which specifically covers coal ash storage and treatment.  *Id.*; *see also VEPCO,* 903 F.3d at 411-412.

The Court should deny FPL's motion and find that the CCS is a point source under the CWA by virtue of its regulation under NPDES Permit No. FL0001562.

## II.    THE PLAIN AND UNAMBIGUOUS LANGUAGE OF FPL'S NPDES PERMIT PROHIBITS ANY DISCHARGE FROM THE CCS TO SURFACE WATERS.

FPL next claims that Plaintiffs' allegations of FPL's violations of Condition I.A.1 of its NPDES Permit are based on a "misrepresentation" of the permit language.  [Doc. 150, p. 10]. However, as discussed in Plaintiffs' Motion for Partial Summary Judgment, [Doc. 149, pp. 14-15], the plain and unambiguous language of FPL's "No Discharge" NPDES Permit repeatedly and unequivocally prohibits any discharge from the CCS to surface waters.  Nevertheless, FPL maintains that, based on extrinsic evidence that directly contravenes the plain language of its NPDES Permit, the permit in fact allows for discharges from the CCS to surface waters, and Biscayne Bay in particular.  The Court should disregard this extrinsic evidence, and further reject FPL's attempt to collaterally attack its NPDES Permit in this federal enforcement action, and find that the plain language of its NPDES Permit prohibits all discharges from the CCS to surface waters, including Biscayne Bay.

### A.    THE COURT DOES NOT NEED TO, AND SHOULD NOT, CONSIDER ANY EXTRINSIC EVIDENCE TO DETERMINE THE MEANING OF FPL'S NPDES PERMIT.

The interpretation of an NPDES permit is a question of law for the court to decide.  *See, e.g., American Canoe Ass'n, Inc. v. Dist. Of Columbia Water and Sewer Authority,* 306 F.Supp.2d 30, 41 (D. D.C. 2004).  When interpreting an NPDES permit, a court must adhere to the standard principles of contract law, as NPDES permits are treated like any other contract.  *Natural Resources Defense Council, Inc. v. County of Los Angeles,* 725 F.3d 1194, 1204 (9th Cir. 2013). If the language of the permit, considered in light of the structure of the permit as whole, is plain and capable of legal construction, the <u>language alone</u> must determine the permit's meaning.  *Id.* at 1204-1205 (emphasis added).   Furthermore, a court should not resort to extrinsic evidence unless the language of the permit is ambiguous, *see, e.g., Northwest Envt'l Advocates v. City of Portland*, 56 F.3d 979, 983-984 (9th Cir. 1995), and the terms of an NPDES permit are only ambiguous if reasonable people could find its terms susceptible to more than one interpretation.  *Kennewick Irrigation District v. United States,* 880 F.2d 1018, 1032 (9th Cir. 1989).

In this case, reasonable people could not find that the terms of FPL's "No Discharge" NPDES Permit pertaining to the prohibition on discharges from the CCS to surface waters are susceptible to more than one interpretation.   On the first page of FPL's NPDES Permit, under **"Wastewater Treatment,"** the permit provides:

> The cooling canal system is not lined, and therefore, discharges to Class G-III groundwater. <u>The cooling canal system does not discharge to surface waters of the state.</u>

[Doc. 149-14, p. 5] [emphasis added].[7]   On the second page, under **"Effluent Disposal,"** the permit provides that "[T]his permit does not authorize discharge to surface waters of the state." [Doc. 149-14, p. 6].   Additionally, on the next page, under **"EFFLUENT LIMITATIONS" – "Surface Water Discharge,"** the permit again states that "[T]his permit does not authorize discharge to surface waters of the state." [Doc. 149-14, p. 7].   As discussed *supra*, an effluent limitation is "any restriction established by a State … on <u>quantities</u>, rates, and concentrations of … constituents which are discharged <u>from point sources</u> …." 33 U.S.C. § 1362(12) (emphasis added).   In fact, "[T]he primary purpose of NPDES permits is to establish <u>enforceable effluent limitations.</u>   *Natural Resources Defense Council,* 725 F.3d at 1204 (quoting *Environmental Law Handbook,* at 327).   Given the purpose and importance of effluent limitations in the CWA's NPDES permitting scheme, the wholly untenable nature of FPL's position that this language does not mean exactly what it says, and that it is not enforceable as written under the CWA by Plaintiffs, becomes even more clear.   Furthermore, and extremely important in light of FPL's contentions in this case, and those pertaining to its and FDEP's interpretation of its NPDES Permit in particular, the Second Amendment to the Fact Sheet at the front of FPL's NPDES Permit states:

> **Condition I.A.6&7.**   The Permittee pointed out that previous permits did not include these conditions, which refer to floating foam and visible sheen on surface waters of the state due to discharge of wastewater.   <u>The Permittee noted that the conditions are not appropriate because the facility does not discharge to surface waters.   The Department concurs, and notes that it included the conditions in error.</u>   The conditions have been deleted from the final permit.

---

[7] As stated in Plaintiffs' Motion for Partial Summary Judgment, this provision also demonstrates that FDEP clearly knew how to authorize any discharge from the CCS, and did so for the CCC's discharge to groundwater, but simultaneously prohibited any discharge from the CCS to surface waters. [Doc. 149, p. 22].

[Doc. 149-14, p. 4] [emphasis added].  Thus, not only did FPL explicitly represent to FDEP that the CCS does not discharge to surface waters in order to have these "inappropriate" permit conditions removed, but FDEP concurred in FPL's position, and removed the conditions at issue pertaining to the effects of surface water discharges.  Therefore, as FPL has previously, based on its representation that the CCS has no discharge whatsoever to surface waters, had effluent limitations removed from its NPDES Permit, it would be wholly inappropriate for the Court to now accept its [new] interpretation of its Permit, as it has already benefitted from representing otherwise, and FDEP was complicit.

The plain and unambiguous language of FPL's NPDES Permit notwithstanding, as well as FPL's express representations to FDEP that the CCS does not discharge to surface waters in order to have effluent limitations pertaining to surface water discharges removed from its NPDES Permit, FPL still argues that that its NPDES Permit authorizes the discharge of industrial wastewater from the CCS to groundwater (which it plainly does), and then further authorizes another discharge into surface waters[8] (which it plainly doesn't), because both FPL and FDEP interpret the permit this way.  [Doc. 150, p. 11].  However, terms of an NPDES permit are to be given their ordinary meaning, and when the terms are clear and unambiguous, as they are here, the intent of the parties must be ascertained from the permit itself.  *Klamath Water Users Protective Ass'n v. Patterson,* 204 F.3d 1206, 1210 (9th Cir. 1999) (emphasis added).  Thus, all references to how FDEP purportedly interprets the permit, and the testimony of FDEP's John Truitt in particular, constitutes extrinsic evidence that should not be considered by the Court.  The same is true for FPL's generalized statements about what is "widely understood" about the hydrogeology of South Florida, [Doc. 150, p. 11], its statements of about what other regulatory agencies purportedly think [Doc. 150, p. 13], and its references to the vague and ambiguous "history of the facility."  [Doc. 150, pp. 13-14].  This is particularly true given that all of this extrinsic evidence directly contradicts the plain and unambiguous language of FPL's NPDES Permit which repeatedly and unequivocally (*i.e.*, no exception for "seepage") prohibits discharges from the CCS to surface waters.

---

[8] FPL's ultimate outcome is that the provisions of the permit "make clear" that the reference to no discharges to surface waters of the state simply means that FPL "can no longer use the pre-CCS discharge canals to send cooling water to the bay."  [Doc. 150, p. 12].  As discussed in the context of FPL's noncompliance with the 1971 Final Judgment, *infra,* this assertion is wholly without merit.

Regarding Mr. Truitt's deposition testimony, the Court should not consider this extrinsic evidence for a wholly separate reason - it constitutes inadmissible lay opinion testimony under Fed. R. Evid. 701. In its Fact Witness Disclosure served on Plaintiffs, FPL designated "a representative" of FDEP as a fact witness, which ultimately was Mr. Truitt. During his deposition, Mr. Truitt testified that he merely reviewed FPL's 2005 NPDES Permit prior to his deposition. [Doc. 148-24, 70:8-9]. Therefore, Mr. Truitt's testimony as to the meaning of FPL's NPDES Permit constitutes inadmissible lay opinion as he was not properly designated as an expert witness pursuant to Fed. R. Civ. P. 26(a)(2)(B). *See, e.g.*, *Holzworth v. United States*, 2011 WL 13298554, at *2–3 (M.D. Fla., May 17, 2011) (holding that lay testimony of a witness is confined to facts perceived by the use of his own senses, as opposed to inferences and conclusions drawn from the facts already in evidence). Accordingly, during Mr. Truitt's deposition, Plaintiffs' counsel was clear that Mr. Truitt's testimony was limited to factual matters [Doc. 148-24, at 12:16-18]; however, FPL counsel persisted in asking Mr. Truitt for expert opinions, and Plaintiffs' counsel objected to all questions calling for such expert testimony. *See, e.g.,* [Doc. 148-24, at 12:16-18 ("Objection, asking this witness questions that call for expert testimony, and I believe he's a fact witness, the facts only"); 13:5-13 (I'm going to continue to object … because I am going to object to any question that calls for anything other than facts of this witness")]. Indeed, all of the portions of Mr. Truitt's deposition testimony cited by FPL as supporting its strained and self-serving interpretation of its NPDES Permit were objected to by Plaintiffs' counsel during Mr. Truitt's deposition. [Doc. 150, p. 13]; [Doc. 151, ¶ 16]; [Doc. 148-24, at 17:19-20; 18:1; 18:18; 18:21-22; 21:10-11; 21:18; 21:24; 30:17].

FPL further asserts, without citation to any legal authority, that "[P]ermits are interpreted against the backdrop of an agency's knowledge," [Doc. 150, p. 13], and argues that FDEP has long known of the CCS's discharge to surface waters. This assertion is plainly contradicted by FDEP's concurrence in removing the effluent limitations from FPL's 2005 NPDES Permit as noted in the Second Amendment to the fact sheet, discussed *supra,* as well as in Mr. Truitt's deposition testimony. Mr. Truitt testified that he was "unaware of any notification from FPL to DEP that there was a discharge of [industrial wastewater] to the east as [the term "discharge"] is defined in our regulations." [Doc. 148-24, 128:16-19]; *see also* [Doc. 148-24, 131:5-6] [Mr. Truitt testifying he was "unaware of any seepage … from the cooling canal to the east"]. Notably, the reason that he was unaware is that FPL, in its application to FDEP for its 2005 NPDES Permit, expressly

11

represented to FDEP, in multiple instances, that there was no discharge to surface waters from the CCS.  [Doc. 149-28, p. 3 (no discharge to surface waters); p. 9 (no discharge to waters of U.S.); p. 10 (same); p. 21 (no discharges to waters of United States from plant site)]; *see also* [Doc. 148-24, 190:19-24, 190:25-191:6, 191:10-14; 191:22-192:1, 192:17-23; 193:1-7.].  Indeed, this application is perhaps the most relevant and probative piece of extrinsic evidence pertaining to FPL's 2005 NPDES Permit; however, FPL, for obvious reasons, did not submit this application to the Court as part of its extensive extrinsic evidence.

FPL's "interpretation" of its NPDES Permit's plain and unambiguous prohibition on any discharge from the CCS to surface waters is baseless, and the Court should reject FPL's attempts to introduce contradictory extrinsic evidence before the Court to interpret the plain and unambiguous language of the permit.  Moreover, FDEP's wavering positions on this issue – which seem to correspond with whatever FPL needs at a given point in time – further weigh against the Court's consideration of Mr. Truitt's testimony or any other evidence of how FDEP purportedly interprets the plain and unambiguous language of FPL's NPDES Permit.  Therefore, the Court should find that the language of FPL's NPDES Permit prohibiting surface water discharges from the CCS is plain and unambiguous, deny FPL's attempts to have the Court consider extrinsic evidence, and enter partial summary judgment for Plaintiff for FPL's liability for discharging industrial wastewater containing pollutants from the CCS to Biscayne Bay in violation of Condition I.A.1 of its NPDES Permit.  *See* [Doc. 149, pp. 19-20].

## B.   FPL CANNOT COLLATERALLY ATTACK THE TERMS OF ITS NPDES PERMIT IN A CITIZEN ENFORCEMENT PROCEEDING.

Additionally, the Court should not allow FPL to mount a collateral attack on the terms of its NPDES Permit in this citizen enforcement proceeding, as FPL failed to challenge the permit under established state procedures when it was issued.  "It is well-settled that a NPDES permit holder may not challenge the validity of the permit in an enforcement proceeding." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs,* 956 F. Supp. 588, 597, (D.S.C. 1997), *vacated on other grounds,* 149 F.3d 303 (4th Cir. 1988), *rev'd on other grounds,* 528 U.S. 167 (2000).  Section 509(b)(2) of the CWA provides that the terms of a permit "shall not be subject to judicial review in any civil or criminal proceeding for enforcement." 33 U.S.C. § 1369(b)(2).  In enacting this section, Congress intended to preclude untimely challenges to permit requirements in enforcement proceedings, and the Senate Report stated:

> An alleged violation of an effluent control limitation or standard, would not require reanalysis of technological or other considerations at the enforcement stage. <u>These matters will have been settled in the administrative procedure leading to the establishment of such effluent control provision.</u>

S. Rep. No. 414, 92d Cong., 1st Sess. 79-80 (1971) (emphasis added); *see also Friends of the Earth, Inc. v. Laidlaw Env't'l Servs,* 956 F. Supp. at 597.  As FPL's NPDES Permit was issued by FDEP pursuant to Florida's delegated authority, had FPL wished to challenge the terms of its NPDES Permit, including the permit's plain and unambiguous prohibition on discharges from the CCS to surface waters, it was required to bring an action under state procedures.  *Id.* at 598 (defendant's remedy, if it believes that the permit was invalid for any reason, was to seek an administrative adjudication pursuant to state law); *General Motors Corp. v. E.P.A.,* 168 F.3d 1377, 1382 (D.C. Cir. 1999) (holding that "precluding collateral attacks ensures that the States [have] the opportunity … to address objections to the permits they issue") (internal citations omitted); *Ohio Valley Env't'l Coalition, Inc. v. Fola Coal Co., LLC,* 2013 WL 6709957 at *12 (S.D. W.Va. Dec. 19, 2013) (same).

However, there is absolutely no evidence before this Court that FPL challenged this provision of its NPDES Permit when it was issued, because FPL failed to do so.  The "Notice of Permit" cover page to FPL's 2005 NPDES Permit expressly provides for judicial review of the permit under § 120.68 of the Florida Statutes within 30 days after the Notice is filed with the Clerk of FDEP. [Doc. 149-14, p. 2].  This Notice was filed with the Clerk of FDEP on May 13, 2005 [Doc. 149-14, p. 3]; therefore, FPL had up to and through June 12, 2005 to seek judicial review of its NPDES Permit.  FPL did not seek such review; rather, it failed to exhaust its administrative remedies, and instead waited over 12 years, until <u>after</u> the filing of this citizen suit, and then began having "recurring discussions" with FDEP about changing the language in its NPDES Permit pertaining to surface water discharges. [Doc. 149-1, ¶ 50]; [Doc. 149-20, 83:10-24]; [Doc. 148-19, 98:12 – 99:11].  This Court should not tolerate these bad faith attempts by FPL to limit its liability for polluting surface waters in violation of its NPDES Permit once Plaintiffs, in the absence of effective regulatory enforcement, were forced to initiate citizen enforcement to redress FPL's CWA violations.

By failing to challenge the terms of its NPDES Permit under Florida law at a time "when its purported deficiency should have been as apparent to [FPL] as it is now, [FPL] is precluded from doing so in this action." *U.S. v. Gulf States Steel,* 54 F.Supp.2d 1233, 1243 (N.D. Al. 1999);

*see also Public Interest Research Group of New Jersey, Inc. v. Powell-Duffryn Terminals, Inc.,* 913 F.2d 64, 78 (3rd Cir. 1990); *Connecticut Fund for the Environment v. Job Plating Co., Inc.,* 623 F. Supp. 207, 217 (D. Conn 1985).

### III.    FPL HAS FAILED TO COMPLY WITH THE PROVISIONS OF THE 1971 CONSENT DECREE.

FPL constructed the CCS in the early 1970's to comply with the terms and conditions of a 1971 Final Judgment of the United States District Court for the Southern District of Florida which required FPL to terminate is discharges of heated cooling water from Turkey Point into Biscayne Bay and other surface waters.  [Doc. 149-1, ¶ 7]; [Doc. 114, ¶ 30], [Doc. 115, ¶ 30]; [Doc. 149-9] ["1971 Final Judgment"].  Condition I.A.14 of FPL's NPDES Permit provides:

> Notwithstanding any other requirements of this 'No Discharge' permit, the permittee shall comply with all applicable provisions of the Final Judgement dated September 10, 1971, in Civil Action Number 70-328-CA issued by the U.S. District Judge C. Clyde Atkins of the Southern District of Florida.[9]

[Doc. 148-14, p. 11] [emphasis added].   The Final Judgment provides, *inter alia*:

> Except as otherwise provided by Paragraph IV of this Final Judgment, all water used by Florida Power and Light to cool its condensers at its generating facilities at Turkey Point shall be discharged into a cooling canal system, and no water shall be discharged from this cooling system into Biscayne Bay, Card Sound, or any other navigable water of the United States or tributary thereof ….

[Doc. 149-9, p. 11] [emphasis added].  This Condition of FPL's NPDES Permit plainly prohibits, like Condition I.A.1, any discharge from the CCS into Biscayne Bay or other surface waters.

Despite this plain and unambiguous language, FPL, in an argument strikingly similar to the one it advances as to its interpretation of its NPDES Permit, contends that it is entitled to summary judgment on Plaintiffs' claim that FPL has violated this condition of its NPDES Permit. Specifically, FPL contends that:

> [I]t is clear that the 1971 [Final Judgment] prohibits discharges from the old discharge canals, not groundwater seepage.

---

[9] It is extremely telling that FPL has not challenged Plaintiffs' ability to enforce this condition of its NPDES Permit under the CWA, which could encompass any number of things unrelated to a "discharge to navigable waters."  However, FPL has repeatedly challenged the enforceability of Condition IV.1 of its NPDES Permit pertaining to groundwater discharges throughout this litigation on the same purported basis, *i.e.,* because there is no discharge to navigable waters.

[Doc. 150, p. 15].  However, such a proposition is not at all "clear;" in fact, this "interpretation" of the 1971 Final Judgment by FPL grossly misrepresents the plain and unambiguous language of the Final Judgment.  FPL also argues that its interpretation of the Final Judgment is correct because the Final Judgment <u>also</u> required FPL to close the man-made canals connecting the cooling system with Biscayne Bay; however, this provision in no way supports FPL's interpretation, as these are two separate requirements.  Similarly, nor does the fact that the Final Judgment recognized seepage "from the cooling system upon the underlying aquifer," as the underlying aquifer is not Biscayne Bay.  Moreover, FPL's assertion as to what DOJ's purposes were for bringing the lawsuit in the first instance is inadmissible hearsay.  [Doc. 150, p. 15].  Furthermore, as discussed *supra,* FDEP's permit interpretations should not considered as the Final Judgment is not ambiguous, and FDEP's interpretations are far from reliable or probative evidence if they are even admissible.  Finally, the fact that DOJ has not brought enforcement action against FPL for discharging from the CCS into Biscayne Bay is irrelevant; in fact, this governmental inaction by the government is the exact reason Plaintiffs were forced to bring this citizen suit in the first instance.

FPL is not entitled to summary judgment on Plaintiffs' claim for violation of the provisions of the Final Judgment, as incorporated into Condition I.A.14 of its NPDES Permit.

## IV.   FPL IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM THAT IT IS DISCHARING WITHOUT A PERMIT IN VIOLATION OF THE CLEAN WATER ACT.

A citizen's suit can be based on an allegation that a defendant is discharging without an NPDES permit.  *See, e.g., Washington Wilderness Coalition v. Hecla Mining Co.,* 870 F.Supp. 983, 986 (E. D. Wash. 1994); *Hudson River Fishermen's Ass'n v. Westchester County,* 686 F.Supp. 1044, 1050, (S.D. N.Y. 1988).  FPL argues that, because it has "a permit authorizing seepage from the CCS to groundwater into offsite surface waters," Plaintiffs cannot bring a claim for discharging without a permit. [Doc. 150, pp. 16-17].

FPL is, as it has previously done, attempting to invoke the permit shield doctrine.[10]  In order to substantively avail itself of this defense, FPL must demonstrate (1) that it has fully disclosed to FDEP all discharges from the CCS, and further (2) that it is otherwise in compliance

---

[10]  As discussed in Plaintiffs' Response in Opposition to FPL's Objections to Report and Recommendation [Doc. 137, pp. 9-10], FPL has failed to affirmatively plead the permit shield defense and has thus waived this affirmative defense.

with the permit.  *Coosa Riverkeeper, Inc., v. Oxford Water Works and Sewer Board,* 2017 WL 2619087 at *15 (N.D. Al. June 16, 2017) (citing *Piney Run Pres. Ass'n v. County Comm'rs of Carroll County,* 268 F.3d 255, 268 (4th Cir. 2001)).  As discussed in Section II, *supra,* FPL has failed to disclose all CCS discharges to FDEP; specifically, it represented to FDEP in its 2005 NPDES Permit application that the CCS does not discharge to surface waters.  [Doc. 149-28, p. 3 (no discharge to surface waters); p. 9 (no discharge to waters of U.S.); p. 10 (same); p. 21 (no discharges to waters of United States from plant site)]; *see also* [Doc. 148-24, 190:19-24, 190:25-191:6, 191:10-14; 191:22-192:1, 192:17-23; 193:1-7.].  Moreover, FDEP's John Truitt confirmed this nondisclosure by FPL in his deposition testimony.  [Doc. 148-24, 128:16-19]; *see also* [Doc. 148-24, 131:5-6].  Thus, for this reason alone, the Court should deny FPL summary judgment on Plaintiffs' claim for FPL's illegal discharges into Biscayne Bay without an NPDES Permit.

FPL also cannot demonstrate that it is in compliance with its NPDES Permit.  Plaintiffs have alleged that FPL is violating Condition I.A.1 of its permit and have produced evidence demonstrating these violations.  *See, e.g.*, *Flint Riverkeeper,* 276 F.Supp.3d at 1359 (rejecting a motion to dismiss based on a permit shield argument as plaintiff alleged defendant was violating NPDES permit); *see also* [Doc. 149-1, ¶¶ 80-85]; [Doc. 149, ¶¶ 26-27].  Furthermore, as discussed in Section II, *supra,* FPL's interpretation of its NPDES Permit is contrary to the plain and unambiguous language of the Permit and impermissibly relies on extrinsic evidence which itself contradicts the permit's plain language.  Thus, FPL cannot demonstrate compliance with its permit at this juncture, and not until the Court rules on the proper interpretation of FPL's NPDES Permit would it be appropriate to consider the merits of Plaintiffs' claim for discharging without a permit, as Plaintiffs have pled this Claim in the alternative as permitted under the Federal Rules of Civil Procedure.

Since the interpretation of the FPL's NPDES Permit is a question of law for the Court to decide, FPL is not entitled to summary judgment on this Claim.  This is particularly true given the fact that FPL's interpretation of its NPDES Permit, and the extrinsic evidence it seeks to rely on, all directly contravene the plain language of the permit.

16

## V. **FPL IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO ITS VIOLATIONS OF STATE GROUNDWATER STANDARDS INCORPORATED INTO ITS NPDES PERMIT.**

### A. **PLAINTIFFS HAVE STANDING TO SUE FOR FPL'S VIOLATIONS OF CONDITION IV.1 OF ITS NPDES PERMIT AND THE CLEAN WATER ACT.**

FPL argues Plaintiffs lack standing to sue for FPL's violations of the groundwater effluent limitations set forth in Condition IV.1 of its NPDES Permit because Plaintiffs cannot demonstrate an injury in fact. However, FPL misrepresents the well-established requirements for demonstrating injury in fact in CWA citizen suits, and erroneously relies on the so-called "shareholder standing" rule, a prudential rule of standing that is inapplicable to a citizen suit under the CWA. Plaintiffs have demonstrated standing to sue for FPL's violations of Class G-II groundwater quality standards.

SACE member Richard Reynolds owns an approximate 300 acre tract of property located less than 2.5 miles southwest of the CCS. [Doc. 149-6, ¶ 2].[11] FPL contends that Plaintiffs lack standing because they cannot demonstrate any impact to Mr. Reynold's <u>property</u> as a result of the CCS's discharges of hypersaline industrial wastewater containing pollutants, including tritium, to the west of the CCS. However, Plaintiffs simply don't have to demonstrate any such impact, as the relevant showing for purposes of Article III standing is not injury to the property, but injury to the plaintiff. *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.,* 528 U.S. 167, 181 (2000) (requiring no evidence of actual harm to the waterway at issue); *Ecological Rights Foundation v. Pacific Lumber Co*., 230 F.3d 1141, 1151 (9th Cir. 2000) (question of standing under CWA is whether individual can show that she has been injured … because of concerns about violations of environmental laws, not whether the plaintiff can show there has been actual environmental harm). As the Supreme Court reasoned in *Laidlaw*:

> To insist upon the former [injury to environment] rather than the latter [injury to plaintiff] as part of the standing inquiry … is to raise the standing hurdle higher than the necessary showing for success on the merits in an action alleging noncompliance with an NPDES permit.

*Laidlaw,* 528 U.S. at 181. Thus, requiring a plaintiff to demonstrate actual environmental harm in order to obtain standing would, in many CWA lawsuits, compel the plaintiff to prove more to show

---

[11] As discussed *infra,* after purchasing the property in his own name in 2013, Mr. Reynolds subsequently quitclaimed the property to Carmatt, LLC, a Florida limited liability company of which he and his wife are the only members. [Doc. 149-6, ¶ 2].

standing than she would have to prove to succeed on the merits. *Id.*; *see also Pacific Lumber Co.*, 230 F.3d at 1151 (noting the CWA allows citizen suits based on violations of any condition of an NPDES permits, even procedural violations, which don't require a showing of harm to the environment).

Instead, to demonstrate injury in fact,[12] what is required is evidence of actual or threatened injury to property in which a plaintiff has a protected interest, or a "reasonable fear and concern" about the effects of FPL's discharges, supported by some objective evidence, that directly affects a plaintiff's property interests. *See, e.g., Friends of the Earth, Inc. v. Gaston Copper Corp.*, 204 F.3d 149, 156, 161 (4th Cir. 2000) ("*Gaston Copper*"). In *Gaston Copper*, the Fourth Circuit held that a plaintiff's claim that pollution, or the threat of pollution, had diminished the value of his property was precisely the type of injury that Congress intended to prevent by enacting the Clean Water Act. *Id.* at 156. Mr. Reynolds has testified, via his Declaration filed in this matter, that the value of his property has been diminished due to the westward migration of the saltwater plume from the CCS towards his property, and also due to the presence of tritium and other pollutants in the groundwater in the immediate vicinity of his property. [Doc. 149-6, ¶ 7]; [Doc. 158-11, 131:17-20; 132:6-11, 132:20-133:22]. As evidenced by Exhibit A to Mr. Reynold's Declaration [Doc. 149-6, p. 6], the results of groundwater testing conducted by DERM in 2011 demonstrated that the groundwater beneath his property had elevated concentrations of tritium. [Doc. 149-6, ¶ 5]; [Doc. 158-11, 20:20 – 21:19]. Additionally, Plaintiffs' expert Edward A. Swakon has testified, after reviewing Mr. Reynolds Declaration, as well as the 2011 DERM tritium analysis, that Mr. Reynold's property is "located in an area where the groundwater has tritium values much higher than established background values," [Doc. 149-23, ¶ 9], and that the CCS is the source of this tritium in the vicinity of Mr. Reynold's property. *Id.* Therefore, Mr. Reynold's has plainly demonstrated injury in fact in that he has shown an actual and threatened injury to his property

---

[12] As discussed in in Plaintiffs' Motion for Summary Partial Judgment [Doc. 149, pp. 12-15], standing requirements in the environmental context are not onerous, as harm or threatened harm to a plaintiff's [property] interests is sufficient to confer standing. *Sierra Club v. Morton,* 405 U.S. 727, 735 (1972). Further, at the summary judgment stage, a plaintiff's evidence of injury in fact, via affidavit or otherwise, in addition to that in the complaint, will be taken as true for purposes of deciding the motion. *Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) at 561.

interests, and also has demonstrated that his concerns about the adverse effects of FPL's discharges on his property interests are reasonable and supported by evidence (*i.e.,* not conjecture).

FPL next argues that the so-called "shareholder standing" rule precludes Plaintiffs' standing as to FPL's violations of the groundwater quality standards in its NPDES Permit, because Mr. Reynolds, after purchasing the property individually in 2013, subsequently transferred the property to Carmatt, LLC ("Carmatt"), a Florida limited liability company of which he and his wife are the only members. [Doc. 149-6, ¶ 2].   However, unlike constitutional standing requirements, prudential standing requirements, like shareholder standing, can be modified or abrogated by Congress.   *Bennett v. Spear,* 520 U.S. 154, 162 (1977).   In enacting the citizen suit provision in the CWA, Congress intended to go to the full extent of Article III by conferring standing on "any person" with "an interest which is or may be adversely affected."   33 U.S.C. § 1365(g); *Gaston Copper,* 204 F.3d at 152.   Thus, the citizen suit provision is regarded as "extending standing to the 'outer boundaries' set by Article III, <u>eliminating the need for a separate prudential standing inquiry</u>." *National Resource Defense Council v. EPA,* 437 F.Supp.2d 1137, 1145 (C.D. Cal. 2006) (*quoting Ecological Rights Foundation v. Pacific Lumber Co.,* 230 F.3d 1141, 1147 (9th Cir. 2000) (emphasis added)); *see also Puerto Rico Campers Ass'n v. Puerto Rico Aqueduct and Sewer Auth.,* 219 F.Supp.2d 201, 214 (D. Puerto Rico 2002) (holding that prudential standing requirements need not be considered in cases brought under the CWA because the act explicitly confers standing).   Even if this Court were to apply the shareholder standing rule to this case, there is an exception to this prudential rule allowing a shareholder with a direct, personal interest in a cause of action to bring suit even if the corporation's rights are also implicated. *Franchise Tax Bd. of California v. Alcan Aluminum Ltd.,* 493 U.S. 331, 336 (1990).   Here, as Mr. Reynolds purchased the property in his own name prior to transferring it to Carmatt, [Doc. 149-6, ¶ 2], he clearly has a direct and personal interest in this matter that provides him with standing, even if Carmatt's rights are also deemed to be implicated.

For the foregoing reasons, Mr. Reynolds has demonstrated a concrete and particularize injury in fact to his property interests, and therefore SACE has demonstrated standing to sue for FPL's violations of groundwater quality standards in violation of Condition IV.1 of its NPDES Permit.

**B.**     **PLAINTIFFS CAN ENFORCE STATE GROUNDWATER QUALITY STANDARDS INCORPORATED INTO FPL'S NPDES PERMIT IN THIS CLEAN WATER ACT CITIZEN SUIT.**

FPL next regurgitates its fundamentally erroneous argument that Plaintiffs cannot enforce FPL's violations of the state groundwater quality standards incorporated into FPL's NPDES Permit in this CWA citizen suit.  As discussed in detail in Plaintiffs' Motion for Summary Judgment [Doc. 149, pp. 9-11] and Plaintiffs' Response in Opposition to FPL's Objections to Report & Recommendation [Doc. 137], both of which are incorporated herein,[13] Plaintiffs can enforce violations of conditions in FPL's state-issued NPDES Permit pertaining to state water quality standards in this citizen suit.  In fact, Plaintiffs can enforce violations of <u>any</u> conditions of an NPDES permit in a citizen suit, including conditions that regulate discharges outside the scope of the CWA such as discharges that may never reach navigable waters.

FPL's first contends, as it has previously, that Plaintiffs cannot enforce violations of Condition IV.1 of its NPDES Permit because the violations are not based on a discharge to "navigable waters."[14]  As discussed in FN 9 *supra,* it is extremely telling that FPL continues to make this argument in regard to this permit Condition, but not others that have no relation to any discharge to navigable waters, such as Condition I.A.14, or Condition VIII.7, which requires FPL to properly operate and maintain the CCS.  *See* [Doc. 114, ¶¶ 65-66].[15]  FPL's tacit concession notwithstanding, it is hornbook environmental law that citizens, under the plain language of 33 U.S.C. § 1365, can enforce violations of <u>all</u> permit conditions contained in an NPDES permit, including conditions that don't regulate discharges to navigable waters.  *See, e.g., American Canoe Ass'n v. District of Columbia Water and Sewer Authority,* 306 F.Supp.2d 30,  (D.D.C. 2004) (CWA allows citizen suits to enforce any NPDES permit condition, whether or not the condition directly regulates water quality); *Gaston Copper,* 204 F.3d at 151-152 (permit holders must comply not only with limitations on the amount of pollutants they may discharge, but also with a variety of

---

[13] In the interest of judicial economy, Plaintiffs will not, again, go through the plain language of the CWA statutory scheme and all case law previously cited demonstrating that FPL's violations of Condition IV.1 of its NPDES Permit are clearly enforceable through this citizen suit.  Plaintiffs respectfully refer the Court to these documents for a more comprehensive argument, as the Court might deem necessary.

[14] Of course, FPL, despite having months and multiple opportunities to locate authority that supports this proposition, cites to absolutely none, because there isn't any.

[15] Indeed, FPL has not even moved for Summary Judgment as to Plaintiffs' claim for its violations of Condition VIII.7 of its NPDES Permit.

monitoring, testing, and reporting requirements); *Piney Run Preservation Ass'n,* 268 F.3d at 265 (same);  *Pacific Lumber Co*., 230 F.3d at 1151 (the CWA allows citizen suits based on violations of any condition of an NPDES permits, even procedural violations, which don't require a showing of harm to the environment); *Northwest Envt'l Advocates v. City of Portland,* 56 F.3d 979, 986 (9th Cir. 1995) (citizens can enforce all permit conditions, including conditions that regulate discharges outside the scope of the CWA, namely discharges that never reach navigable waters); *Connecticut Fund For Env't v. Raymark Indus., Inc.,* 631 F.Supp. 1283, 1285 (D. Conn. 1986) (citizens can enforce permit conditions relating to discharges that never reach navigable waters); *Sierra Club v. City and County of Honolulu,* 2008 WL 3850495 at *18 (D. Hawaii Aug. 18, 2008) (ground-only sewage spills that do not reach navigable waters are violations of the CWA because they are violations of an NPDES permit); *Sierra Club v. Simkins Industries, Inc.,* 847 F.3d 1109, 1115 (4th Cir. 1988) (reporting requirements of NPDES permit enforceable through citizen suit as violations of "effluent standard or limitation"); *Pymatuning Water Shed Citizens for a Hygienic Env't v. Eaton,* 506 F. Supp. 902, 908 (W.D. Pa. 1980) ("Inasmuch as we have found violations of the NPDES Permit it is unnecessary to determine whether plaintiffs have proved violations of … § 1311(a) or any other section of the CWA");  40 C.F.R. § 122.41(a) ("Conditions Applicable to all NPDES Permits") ("The permittee must comply with all conditions of this permit. Any permit noncompliance constitutes a violation of the Clean Water Act and is ground for enforcement action").

FPL next argues that Plaintiffs cannot enforce its violations of Condition IV.1 of its NPDES Permit because this condition was not included in the permit pursuant to the CWA, *i.e.*, that this Condition is not an "effluent standard or limitation under this chapter" pursuant to 33 U.S.C. § 1365(a)(1), but, rather, a provision of state law.  However, like its "navigable waters" argument, FPL can cite to no authority that actually supports this contention; in fact, FPL's argument is directly contradicted by binding precedent, as previously recognized by this Court.  *See* [Doc. 62, p. 6].

In *Parker v. Scrap Metal Processors, Inc.,* 386 F.3d 993 (11th Cir. 2004), the Eleventh Circuit expressly held that a "plain reading of [Section 505] indicates that <u>state permits and conditions</u> fall within the effluent standards or conditions covered '<u>under this chapter</u>.'" *Id.* at 1006-1007 (emphasis added); *see also Culbertson v. Coats Am., Inc.*, 913 F. Supp. 1572, 1581 (N.D. Ga. 1995) (the definition of "effluent standard or limitation under this chapter" includes

federally mandated standards or limits and Georgia water quality standards incorporated into NPDES permit); *Chattahoochee Riverkeeper Fund, Inc.* v. *City of Atlanta,* 953 F.Supp. 1541, 1552 (N.D. Ga. 1996) ("A review of the statutory scheme of the Clean Water Act reveals that <u>an effluent standard or limitation under the Clean Water Act includes an effluent standard or limitation established by a state</u>") (emphasis added).   Furthermore, numerous courts have found that federal jurisdiction over CWA citizen suits alleging violations of conditions in state-issued NPDES permits pertaining to state water quality standards similar to the minimum criteria for groundwater incorporated into FPL's NPDES Permit.  *See, e.g., Culbertson Arms, supra; Natural Resources Defense Council v. Metropolitan Water Reclamation District of Greater Chicago,* 175 F.Supp.3d 1041, 1052 (N.D. Ill. 2016) (Illinois water quality standards, once incorporated into an NPDES permit, become "substantively enforceable terms"); *Northwest Envt'l Advocates,* 56 F.3d at 988 (language of CWA, as well as legislative history, and implementing regulations uniformly support broad citizen enforcement, including authority to enforce state water quality standards); *Ohio Valley Envt'l Coalition v. Elk Run Coal Co., Inc.,* 2014 WL 29562 at *8 (S.D. W.Va. Jan. 3, 2014) (more stringent West Virginia water quality standards incorporated into NPDES Permit enforceable under the CWA).

Thus, Plaintiffs have standing to sue for FPL's violations of Condition IV.1 of its NPDES Permit, and these violations are enforceable in this citizen suit.  Furthermore, given that FPL has admitted that the CCS's discharge of hypersaline water to the underlying Biscayne Aquifer has resulted in a hypersaline plume that has spread west into formerly freshwater areas, and that the CCS is the "major contributing cause" of the continuing westward movement of the saline water interface, [Doc. 151, ¶¶ 44-46, 55], [Doc. 150, p. 5], FPL's liability for its violations of Condition IV.1 of its NPDES Permit and the CWA is undisputed, and therefore the Court should enter partial summary judgment for Plaintiffs for FPL's liability for its violations of Condition IV.1 of its NPDES Permit.  *See* [Doc. 149, pp. 8-13].

**VI.   FPL'S DISCHARGES OF NUTRIENT LADEN INDUSTRIAL WASTEWATER FROM THE CCS TO BISCAYNE BAY VIOLATES FLORIDA'S NUTRIENT WATER QUALITY CRITERIA IN VIOLATON OF ITS NPDES PERMIT AND THE CWA.**

Section VIII. 5 of FPL's NPDES Permit provides, in pertinent part:

This permit does not relieve the permittee from liability and penalties for harm or injury …caused by the construction or operation of this permitted source; <u>nor does it allow the permittee to cause pollution in contravention of Florida Statutes and</u>

Department rules …

[Doc. 149-14, p. 15] [emphasis added]; *see also* [Doc. 149-14, p. 15, Condition VIII.12]. FPL has violated these conditions of its NPDES Permit, and the CWA, as well as § 403.088(1), Fla. Stat., by discharging nutrient laden industrial wastewater from the CCS to Biscayne Bay through hydrologically connected groundwater, thereby causing or contributing to violations of numeric and narrative nutrient surface water quality standards in Biscayne Bay on hundreds of occasions. *See* [Doc. 149-11, pp. 126-132, Ex. 4 (p. 26)]. Furthermore, FPL's discharges of industrial wastewater containing nutrients from the CCS violate Florida's "no degradation" standard, which applies to Biscayne National Park and the Biscayne Bay Aquatic Preserve. Thus, FPL's motion for summary judgment on this Count should be denied.

## A. FPL'S DISCHARGES OF POLLUTED INDUSTRIAL WASTEWATER FROM THE CCS TO BISCAYNE BAY VIOLATE NUMERIC AND NARRATIVE NUTRIENT CRITERIA.

Nutrient water quality criteria in Florida is evaluated under either a narrative or numeric standard, depending the body of water at issue. In Biscayne Bay, a numeric nutrient standard is applied, and there are different numeric criterion for different Estuary Nutrient Regions ("ENRH"). *See* Rule 62-302.532, F.A.C. In the canal system outside Biscayne Bay, a narrative nutrient criterion is applicable, which requires that nutrient concentrations in these canals not "be altered so as to cause an imbalance in natural populations of aquatic flora and fauna." Rule 62-302.530(48)(b), F.A.C. Plaintiffs have demonstrated that FPL has, in violation of the express conditions of its NPDES Permit, the CWA, as well as Florida law, violated the numeric nutrient criteria in Biscayne Bay as well as the narrative nutrient criteria in the remnant canals.

It is undisputed that there are high levels of nutrients present in the CCS, as well as the surrounding canal system, including nitrogen, phosphorus, and chlorophyll-a. *See* [Doc. 151, ¶¶ 31, 33]; [Doc. 149-1, ¶¶ 14, 33, 36, 39]. Furthermore, given the undisputed hydrologic connection between the CCS and Biscayne Bay, FPL discharges these nutrients to the Bay from the CCS via the groundwater in the underlying aquifer along with CCS industrial wastewater. In particular, Plaintiffs have established that CCS discharges have resulted in exceedances of applicable numeric nutrient levels at two surface water monitoring wells, TPBBSW-6 and TPBBSW-7, in Biscayne Bay. Moreover, these nutrient levels at these same monitoring locations also violate the narrative nutrient criteria applicable to the canals located inland of these monitoring locations.

1.     <u>Violations of Numeric Nutrient Criteria.</u>

In regard to its violations of numeric nutrient criteria, FPL first contends that that numeric nutrient criteria "do not apply to individual samples or even individual sampling locations. Instead, each limit is expressed as [an] 'annual geometric mean,'" or an "open water, area-wide average." [Doc. 150, p. 24].  This contention is incorrect, as the samples were taken, in large part, at two locations in or near Biscayne Bay, TPBBSW-6 and TPBBSW-7.  TPBBSW-6 is located firmly within Biscayne Bay and is therefore subject to the numeric nutrient standards established for the corresponding ENRH, ENRH 6.  [Doc. 149-11, p. 6.]  TPBBSW-7 is located a few feet from the mouth to Biscayne Bay, barely within the Turtle Point Canal.  *Id.*  In his analysis, Mr. Martin relied on the numeric nutrient criteria contained in 62-302.532, F.A.C., and noted that the regulation "requires that the annual geometric mean of a regulated nutrient not exceed the established criteria more than once in a three-year period." *Id.* at 6.  Based on the foregoing, Mr. Martin found 244 violations of the numeric nutrient criteria at surface water testing stations in Biscayne Bay, the majority of which were found at TPBBSW-6 and TPBBSW-7.  *Id*. at Ex. 4 (pp. 26-120).

FPL next asserts it is in compliance with ENRH nutrient limits in Biscayne Bay near Turkey Point because the 2016 Consent Order with FDEP did not find any exceedances of surface water standards <u>in the information provided by FPL</u>, and that Plaintiffs provide no evidence to the contrary.  *Id*. at 25 (emphasis added).  However, this assertion is based solely on conclusory allegations made in FPL's motion as to the purported bases for its Motion to Exclude Plaintiffs' expert Larry Brand, with no specific citations, [Doc. 150, p. 25], and does not address, much less refute, Mr. Martin's expert opinion that these exceedances are in violation of the numeric criteria.  As such, there is, at a minimum, material factual issues on this issue.

FPL next erroneously argues that Plaintiffs must meet a <u>but for</u> causation standard, *i.e.*, show that but for FPL's discharges to the Bay from the CCS, these violations of water quality standards would not occur.  As an initial matter, the causation standard posited by FPL is not supported by the language of the NPDES Permit or common application of the CWA, nor is it consistent with Florida law.  § 403.088(1), Fla. Stat., provides, *inter alia:*

> Without the written authorization of the department, a person may not discharge any waste into the waters of the state which, <u>by itself or in combination with the wastes of other sources</u>, reduces the quality of the receiving waters below the classification established for such waters ….

*Id.* (emphasis added).   This is plainly a "cause or contribute" standard, and FPL's contention that

Condition IV.1 of its NPDES Permit – applicable to CCS discharges to <u>groundwater</u> - establishes "but for" causation is wholly without merit.  In contrast, the allegations in Count III of the Second Amended Complaint refer to the <u>surface water</u> regulations in Rule 62-302.530(47)(b), F.A.C., and other comparable sections, [Doc. 114, ¶ 76], and the relevant permit conditions require that FPL not allow discharges that exceed state limits. [Doc 149-14, pp. 14-15].  Specifically, the permit language in question states that permittees are not allowed to "cause pollution in contravention of Florida Statutes and Department Rules."  *Id.* at 14.[16]  Thus, FPL, by causing or contributing to violations of these narrative nutrient standards, has discharged industrial wastewater containing pollutants from the CCS to Biscayne Bay is a violation of FPL's NPDES permit.

Finally, FPL argues that there is no way to prove that any nutrient exceedances are a result of CCS water seepage; however, this argument too, is incorrect.  Plaintiffs need not show that there are no other contributing factors to elevated nutrient levels in Biscayne Bay, but instead must show that the discharge of industrial wastewater containing pollutants from the CCS is <u>causing or contributing</u> to violations of the numeric nutrient standards. *See* § 403.088(1), Fla. Stat.  It is undisputed that tritium is a reliable tracer for CCS water, [Doc. 191, ¶ 25]; [Doc. 149-1, ¶ 29], and therefore the presence of tritium in Biscayne Bay at above background levels in water samples that also contain nutrient exceedances establishes that these nutrient exceedances can be directly attributed to discharges from the CCS.   [Doc. 149-1, ¶ 84].  In Mr. Martin's report, he noted that "Elevated tritium levels are also indicated" at these locations at "levels ranging as high as 4000 pCi/L and well in excess of background levels for the Bay waters."  [Doc. 149-11, p. 5 & Figure 7].

2.   <u>Violations of Narrative Nutrient Criteria.</u>

FPL also contends that Plaintiffs have failed to establish that FPL is violating narrative nutrient criteria, and in particular as applicable to Turtle Point Canal.  As discussed *supra,* the expert report of Kirk Martin sets out specific numeric nutrient exceedances at surface water monitoring station TPBBSW-7, which is located a few feet within the Turtle Point Canal from Biscayne Bay.  [Doc. 149-11, p. 6 & Figure 5].  Given that these criteria simply set numeric

---

[16] As discussed in detail in Section V, *supra,* under the CWA, "Any permit noncompliance constitutes a violation of the [CWA] and is grounds for enforcement action."  40 C.F.R. 122.41(a); *see also Parker v. Scrap Metal Processors, Inc.,* 386 F.3d 993, 1006-1007 (11th Cir. 2004).

indications of when aquatic flora and fauna will be impaired, it would follow logically that a violation of the numeric nutrient criteria would also result in a violation of the narrative nutrient criteria set out in Rule 62-302.530(48), F.A.C., *i.e.,* altering and creating an imbalance in natural populations of aquatic flora and fauna.

Plaintiffs' experts Dr. Larry Brand and Dr. Jim Fourqurean provide further support for FPL's violations of the narrative nutrient criteria.   Dr. Fourqurean explains the natural state of the seagrass and nutrient system that previously existed in and around Biscayne Bay:

> The seagrasses along the coastline of the Cooling Canal System (CCS) existed for thousands of years in a nutrient-limited state, which means any addition of new nutrients changes the balance of these ecosystems. Increased nutrients harm the ecosystem by increasing the rates of primary production by marine plants. Increase in growth rates means that faster-growing, noxious marine plants, like macroalgae (seaweeds) and microscopic algae and photosynthetic bacteria, overgrow and outcompete seagrasses and corals for light, leading to the losses of corals and seagrasses.

[Doc. 148-27, p. 4] [emphasis added]. This fundamental change to the composition of Biscayne Bay and the surrounding canals is directly linked to the influx of CCS water.  Ex. C, p. 2; Ex. D, p. 2. This is particularly true for water reaching the remnant canals, as noted by Dr. Brand:

> [T]here is no time lag between when the water level in the CCS rises and the high nutrient count shows up in Biscayne Bay [at TPBBSW-7].  This indicates there is a higher flux of groundwater from the CCS into Biscayne Bay at this location.

[Doc 148-26, p. 12] [emphasis added].   He further opined that this pollution is causing eutrophication, which leads to "algal blooms, the development of increasingly anaerobic sediments, alteration of the benthic community, sea-grass die-off, and alteration of the entire food web and ecosystem" and cautions this will result in the ecosystem reaching a "critical point where there is a sudden change."  *Id.* at 24; *see also* Ex. C, p. 2.

FPL asserts that its proposal to backfill the abandoned discharge canals in order to comply with FDEP's Consent Order will be sufficient to stop any additional spread of contaminates from the CCS.  [Doc. 150, p. 24].  However, Plaintiffs' expert, Mr. Martin, expressly rebutted this assertion, stating "other pathways for contaminant travel are not addressed by FPL's proposed plan" and "numerous natural underground connections… exist within the Biscayne Aquifer" that, alongside data collected from these locations, would "indicate migration of contaminants from the CCS into the Bay" will continue, especially when these canals are at low tide.  [Doc. 59-1, p. 4]. Mr. Martin has further opined that not only is this plan unlikely to be entirely effective, but also

the model that FPL used and FDEP relied upon to justify these measures "has a number of technical issues." *Id.* at 5-6; [Doc. 40-3, ¶ 9]

FPL's illegal discharges of polluted industrial wastewater from the CCS to Biscayne Bay are being made in violation of their NPDES permit, the CWA and Florida law governing both narrative and numeric nutrient standards. This violation is causing or contributing to damage to a delicately balanced ecosystem by increasing nutrient levels beyond what can support the health of the flora and fauna in Biscayne Bay and the surrounding canals. Therefore, FPL's motion for summary judgment should be denied.

**B.    FPL'S DISCHARGES OF CONTAMINATED INDUSTRIAL WASTEWATER FROM THE CCS TO BISCAYNE BAY VIOLATE FLORIDA'S "NO DEGRADATION" STANDARD.**

The same section of Florida law that defines the narrative nutrient standards referenced *supra* also prevents any discharges of nutrients that would result in violations of other sections of Florida law relevant to surface water conditions. Rule 62-302.530(48)(a), F.A.C. One of those sections affords special protections for Outstanding National Resource Waters and Outstanding Florida Waters, both of which apply to Biscayne Bay. *See* Rule 62-302.700, F.A.C. Specifically, this Rule prohibits any degradation of water quality in these protected waters. Rule 62-302.700(1). "Man-induced nutrient enrichment (total nitrogen or total phosphorus) shall be considered degradation in relation to the provisions of … Rule 62-302.700." Rule 62-302.530(48)(a). Therefore, FPL's discharge of nutrient enriched industrial wastewater from the CCS to Biscayne Bay directly violates Rule 62-302.700(1), Florida's "no degradation" rule.

FPL argues that its discharges of industrial wastewater containing pollutants from the CCS to Biscayne Bay do not violate this provision of Florida law because the intake and remnant canals are excluded from the protected area, FPL's violations constitute a preexisting activity or discharge and are thus not subject to the regulation, and the "no degradation" rule does not apply because FPL's discharges have not worsened the water quality as compared to the baseline. [Doc. 150, p. 27.] However, one of these arguments has merit. As described more fully above and throughout this brief, FPL's discharges from the CCS are reaching the surface waters of Biscayne Bay through a direct hydrologic connection with Biscayne Bay. At the least, TPBBSW-6 is located well within Biscayne Bay and Plaintiffs' experts have opined that the results of surface water monitoring at this location show nutrient levels exceeding the numeric nutrient criteria and the presence of substantial amounts of tritium, linking the water to the CCS. [Doc. 149-11, p. 126]; Ex. D, p. 2;

27

Ex. C, p. 2.  Furthermore, there is evidence of a tidal connection between the remnant canals and Biscayne Bay, which would lead pollutants, including nutrient enrichment, into the Bay.  *See* [Doc. 149-12].  Given that the statute prohibits <u>any</u> degradation of protected waters, and <u>any</u> man-made nutrient enrichment is considered degradation, FPL's discharges violate the "no degradation" rule.

Neither is FPL grandfathered into polluting the protected waters of Florida.  *See* [Doc. 150, p. 27].  The "no degradation" rule does not apply to discharges already permitted on the date of the Outstanding Florida Water designation.  Biscayne Bay National Park and Biscayne Bay Aquatic Preserve, geographically overlapping national and state parks, are considered Outstanding National Resource and Florida Waters. Rule 62-302.700, F.A.C. These designations provide a baseline from which to measure water quality standards, the five-year period between March 1, 1976 and March 1, 1981 (Outstanding National Resource Waters), and March 1, 1979 (Outstanding Florida Waters).  While FPL received its first NPDES permit prior to the earliest date, 1976, there are no conditions in FPL's NPDES permit then or throughout the years that allows for discharges to Biscayne Bay, and, in fact FPL's subsequent agreements and enforcement actions with state agencies expressly prohibit <u>any</u> discharges to the Bay.  *See* [Doc. 158-20, p. 17:6-9];. FPL cannot be grandfathered into an exception that it is not even eligible for in the first instance.

Finally, FPL's assertion that the CCS discharges could not have worsened pollution because the CCS was already in operation on the date when the baseline was set is flawed.  [Doc. 150, p. 27].  FPL claims this to be true because operation of the CCS has not changed since 1973. *Id*. at 28; [Doc. 151, ¶ 3]. However, this is patently false.  *See* [Doc. 149-1, ¶¶ 33-40].  In fact, the most direct example of this, as has been discussed throughout the pleadings and discovery in this case, is the uprate of Turkey Point Units 3 and 4 undertaken in 2012 and 2013.  As a result of this uprate, FPL has had to add water to the CCS, a process called "freshening," in order to lower salinity levels. Ex. A, pp. 4-5, 6; [Doc. 114, ¶¶36-37]; [Doc. 149-12, ¶ 8]; [Doc. 149-34, at 1-7]; [Doc. 149-17, 2]; [Doc. 149-10, 15].  This "freshening," in and of itself, constitutes changes to the operation of the CCS and, in fact, has resulted in increased discharges of industrial wastewater with more pollutants from the CCS, leading to the very violations at issue in this lawsuit. Additionally, salinity levels have steadily increased within the CCS over time, and particularly since the EPU process was begun, thereby causing the CCS to transform from a seagrass-based ecosystem to an algal-based ecosystem. [Doc. 149-1, ¶¶ 33-37]; [Doc. 151-44, ¶ 44].  Therefore, it is clearly at issue whether and how much FPL's discharges have impacted the ecosystem of

28

Biscayne Bay, and FPL is not entitled to summary judgment as to Count III of Plaintiffs' Second Amended Complaint.

## VII.   FPL IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO ANY OF PLAINTIFFS' PROPOSED REMEDIES.

Finally, FPL asserts that the Court should enter summary judgment in favor of FPL as to Plaintiffs' "proposed remedies." Given its admission of liability for the hypersaline groundwater contamination to the west of the CCS, as well as its admission that there is, in fact, a direct hydrologic connection between the CCS and Biscayne Bay, it is not too surprising that FPL resorts to such an argument at the summary judgment stage. However, FPL's argument is baseless and should be rejected outright by the Court.

FPL first asserts that Plaintiffs' (non-defined) "request for injunctive relief" should be barred by the doctrine of laches, as a member of Tropical Audubon Society commented on the 1972 EIS pertaining to the CCS. Thus, FPL is contending that, because one person (whose knowledge it can in no way impute to any person relevant to the instant matter) read and commented on a document approximately 50 years ago, all three Plaintiff organizations and their members should be barred, based on equitable grounds, from prosecuting this citizen suit. Of course, FPL fails to recognize that none of the violations alleged in this citizen suit had occurred in 1972, or that there has to be some violation to prosecute, and moreover an ongoing violation. Indeed, the CWA, as amended, did not even become effective until October of 1972. The Court should dismiss FPL's laches argument outright, particularly in light of FPL's unclean hands, as discussed in Section II, *supra.*

FPL next argues that Plaintiffs have failed to exhaust their administrative remedies. Of course, like many of its arguments, FPL cites absolutely no authority in support for this contention, outside of some confusing discussion of the Consent Order intertwined with the NRC considering FPL's application to extend the operation license for Units 3 & 4, a proceeding in which SACE has intervened. Indeed, it is not even clear what "administrative remedies" FPL contends Plaintiffs have failed to exhaust. Regardless, as was established earlier in this litigation, the CWA citizen suit provision, 33 U.S.C. § 1365, makes "no mention of exhaustion of state remedies as a prerequisite for bringing a citizen suit." *Black Warrior Riverkeeper v. Birmingham Airport Auth.,* 561 F.Supp.2d 1250, 1255 (N.D. Al. 2008); *see also Ohio Valley Envt'l Coalition, Inc. v. Apogee Coal Co., LLC,* 531 F.Supp.2d 747, 756 (S.D. W.Va 2008). This reason for this is that the CWA

has its own mechanism allowing an agency to act – its pre-suit notice and timing requirements - and moreover confers federal jurisdiction only if specified conditions are met.  *See* 33 U.S.C. § 1365(b); *see also Apogee Coal Co.,* 531 F.Supp.2d at 756 (district courts should defer to administrative action for 60 days, and if the violations have not been halted at the end of 60 days, the citizen suit may proceed).

Here as previously found by the Magistrate Judge, Plaintiffs fully complied with all requirements of § 1365, and FPL "does not challenge said compliance." [Doc. 62, p. 2]. Regardless, FPL attempts to do so – again – now.  The Court should deny FPL's motion.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court deny FPL's motion in its entirety, and, based on its admissions, grant Plaintiffs' motion for partial summary judgment for FPL's liability for its violations of Condition I.A.1 and IV.1 of its NPDES Permit and the CWA.

Respectfully submitted this 31st day of October, 2018.

<div style="margin-left:40%">

*/s/ James M. Porter*
James M. Porter
(Fla. Bar No. 443239)
JAMES M. PORTER, PA
9350 South Dixie Highway
10th Floor
Miami, Florida 33156
(305) 671-1345
Jim@JamesMPorterPA.com

Gary A. Davis
(N.C. Bar No. 25976)
(*Pro Hac Vice*)
James S. Whitlock
(N.C. Bar No. 34304)
(*Pro Hac Vice*)
DAVIS & WHITLOCK, P.C.
21 Battery Park Avenue, Suite 206
Asheville, NC 28801
(828) 622-0044
(828) 398-0435
gadavis@enviroattorney.com
jwhitlock@enviroattorney.com

</div>

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 31, 2018, the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

<u>/s/ James M. Porter</u>
Counsel for Plaintiffs